Syllabus.

## Richmond.

REAVES WAREHOUSE CORPORATION v. COMMONWEALTH,
AND R. A. MOTLEY AND W. A. MOTLEY, PARTNERS,
ETC., v. COMMONWEALTH.

January 15, 1925.

1. WAREHOUSES AND WAREHOUSEMEN—*Tobacco—Acts of 1923, page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner.*—Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner, is constitutional and valid and is not class legislation, nor does it deny warehousemen the equal protection of the law.

2. STATUTE—*Constitutionality—Legislative Usurpation.*—Legislative usurpation ought to be very clear, palpable, and oppressive to justify the interposition of the judiciary. In a government such as ours, of reserved powers, the legislative department acknowledges no superiors, except the Federal and State Constitutions, and its authority to enact laws unless forbidden by one or the other of those instruments in express terms, or by necessary implication, is paramount.

3. CONSTITUTIONAL LAW—*State Constitution—United States Constitution—Grant and Limitation.*—Where the constitutionality of an act is questioned and the State Constitution is under consideration, it must be shown that there is some inhibiting constitutional limitation, for in the absence of such a limitation there is none upon the power of the General Assembly. By contrast, of course, the Federal Constitution is the source of power of the Congress of the United States, that being an enabling and not a restraining instrument.

4. STATUTES—*Constitutionality—Doubtful Case.*—In a doubtful case it is the province of the courts to resolve all doubts in favor of the constitutionality of an act of the legislature. An act of the General Assembly can be declared void only when such act clearly and plainly violates the Constitution, and in such manner as to leave no doubt or hesitation in the mind.

5. STATUTES—*Constitutionality—Burden of Proof.*—Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden.

6. CONSTITUTIONAL LAW—*Statutes Regulating Sale of Tobacco.*—It appears that from early Colonial days until now statutes regulating the sale of tobacco have 'been enacted in the tobacco growing States, and their validity has generally been accepted.

7. STATUTES—*Constitutionality—Wisdom—Expediency.*—The wisdom, expediency, justice or injustice of a statute are for the legislature, not for the courts.

8. WAREHOUSES AND WAREHOUSEMEN—*Police Power—Public Interest—Tobacco Warehouses.*—Public warehouses are affected with a public interest and are subject to regulation by the legislature. And because tobacco warehouses are impressed with this public interest they may be regulated under the police power.

9. POLICE POWER—*Regulation of Business—Validity of Statutes.*—A statute regulating a business affected with a public interest should be sustained if reasonably related to a subject included in the power of the legislature and tends in a degree that is perceptible and clear towards the preservation of the public welfare, towards the prevention of some offense or manifest evil, or to the furtherance of some object within the scope of the police power. The prevention of fraud, deceit, cheating and imposition is certainly within this power.

10. POLICE POWER—*Useful Business—Legitimate Business.*—A business may be useful, yet the method of conducting it may be conducive of fraud. There may be inducements to fraud in a perfectly legitimate business and cases in' which the danger of fraud may be minimized in conducting such legitimate business. Therefore, a perfectly legitimate business may be a subject of regulation under the police power.

11. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Object.*—The Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner was adopted to prevent fraud, and, if there had been a universal custom of warehousemen to indulge in such subterfuges whereby frauds were promoted, then it is manifest that the occasion had arisen for the State to intervene to prevent them. It is a valid exercise of the police power; it is not an arbitrary interference with private business; indeed, the statute recognizes and accommodates itself to the customary methods of such business; namely, the identification of the specific piles of tobacco by the name of the true owner. That this invades no property rights is apparent.

12. POLICE POWER—*Regulation of Lawful Business.*—The State may regulate any business, however lawful in itself, which may be so conducted as to become the medium of fraud and dishonesty.

13. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Clauses 12, 18 of §63 of the Constitution of 1902.*—The Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner does not violate clauses 12, 18, of §63 of the Constitution of 1902,

which provide that no local, special, or private law shall be enacted which regulates labor, trade, mining, or manufacturing, or the rate of interest on money, or to grant to any private corporation, association, or individual an especial or exclusive right, privilege, or immunity.

14. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Classification—Not a Special Act.*—The Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner applies throughout the State and to all persons and property within the specified class, namely, to all growers and dealers in leaf tobacco, to all tobacco warehouses and to all associations, organized for the marketing of such tobacco. It could not intelligently or appropriately be applied to any others, because no others are within that general classification. The statute, therefore, is general and not special. The classification is neither arbitrary nor unreasonable.

15. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Not Violation of the Provisions against General Search Warrant.*—The Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner does not violate the fourth amendment of the Federal Constitution, and section 10 of the Virginia Bill of Rights, prohibiting general search warrants, the privileges granted by the act have no relation to general search warrants for the detection of crime.

16. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Proviso in §2 as to Dealers.*—In section 2 of the Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner there is a proviso that "this section shall not apply to licensed leaf tobacco dealers offering for resale tobacco once sold upon the warehouse floor, and with respect to which the provisions of this act have previously been complied with." The proviso is limited to section 2, and does not apply to any other section of the act. It does not purport to relieve the warehouseman of his obligations under any of the sections of the act. Notwithstanding the proviso, it is still true, under section 1, that it is the duty of the warehouseman to keep a true record, and it is also his duty, under section 3, to display upon tobacco offered for sale the ticket or card showing such record so required by section 2, and it is also true, under section 5, that the warehouseman who buys or sells tobacco, as set forth in the act, knowing that the name used is false or fictitious, is guilty of a misdemeanor.

17. WAREHOUSES AND WAREHOUSEMEN—*Acts of 1923, Page 129, Requiring that Leaf Tobacco be Sold Only in the Name of the True Owner—Fictitious Name on Pile of Tobacco—Refusing Permission to Read Tags.*—Placing a fictitious name on a pile of tobacco and denial of permission to an

agent of the cooperative association to read the tags upon piles of tobacco in the warehouse are clear violations of the Acts of 1923, page 129, requiring that leaf tobacco be sold only in the name of the true owner.

18. STATUTES—*Presumption of Constitutionality.*—It is insufficient merely to suggest the unconstitutionality of statutes, because there is always the presumption that they are valid, and the burden is upon one who assails it to show its invalidity to the impartial mind, and every fair doubt must be and should always be resolved in favor of its validity.

Error to a judgment of the Circuit Court of Halifax county.

*Affirmed.*

The opinion states the case.

*McKinney & Settle, R. E. Scott* and *Randolph Harrison,* for the plaintiffs in error.

*Jas. S. Easley, John R. Saunders,* Attorney General, *W. T. Joyner, Aaron Sapiro,* and *John Martin,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

These cases were heard together, and the constitutional questions raised therein are identical. Both of the plaintiffs in error operate tobacco warehouses, and each has been convicted under an act approved March 26, 1923 (Acts extra session 1923, page 129), entitled "an act to require leaf tobacco to be sold only in the name of the true owner thereof; to require records of such sales to be kept; to require the keeper of such records to permit the inspection thereof by any person, and permit access for the purpose of such inspection; and to provide penalty for the violation thereof." The text of the act is printed in the margin.*

---

*Be it enacted by the General Assembly of Virginia as follows:

Section 1. Every person who shall deliver any leaf tobacco to a warehouseman or to a cooperative marketing association for sale, offer for sale,

[1] 1. The first assignment of error is, as stated in the petition in the *Motley Case:* "To the ruling of the court in overruling the motion to dismiss the warrant, on the ground that the act violates certain provisions of the Constitution of the United States and the Constitution of the State of Virginia."

More specifically, in the *Reaves Case,* it is contended that the act is contrary to the provisions of the Constitution of the United States, especially the fourth, fifth and fourteenth amendments thereto, and also to sections 10, 11 and 63 of the Constitution of Virginia. The emphasis is upon the claim that it is class legislation and denies the warehousemen the equal protection of the law.

It appears that the entire crop of leaf tobacco in Virginia is marketed either by warehousemen or by The Tobacco Growers Cooperative Association, and it is argued that the motive and effect of the act is to pro-

or display for sale thereof, shall impart to such warehouseman or cooperative marketing association, the true name of the owner of said leaf tobacco; and it shall be the duty of such warehouseman or cooperative marketing association to keep a record of such purchase or delivery showing the quantity of leaf tobacco so delivered, and said name of the owner thereof given as provided herein.

Section 2. Where leaf tobacco is delivered to a warehouseman or cooperative marketing association for sale, offer for sale, or display for sale, by a person other than the grower thereof, or the landlord of the land upon which said tobacco was grown, it shall be the duty of said warehouseman or cooperative marketing association to keep a record showing the facts required in section one of this act, and in addition thereto if possible the name of the person from whom the person delivering said tobacco obtained the same, and the name of the original grower thereof, and the name of the landlord upon whose land said tobacco was grown, if the same was grown by a tenant. And said person, other than such grower or landlord, shall impart to such warehouseman or cooperative marketing association the true name of the person from whom he obtained said tobacco, and the name of said grower thereof and said landlord. Provided, however, that this section shall not apply to licensed leaf tobacco dealers offering for resale tobacco once sold upon the warehouse floor, and with respect to which the provisions of this act have previously been complied with.

Section 3. Said warehouseman or cooperative marketing association shall also place upon all leaf tobacco delivered to him or to it for sale, offer for sale, or display for sale, a ticket or card which shall state the matters and things required to be recorded by said warehouseman or cooperative marketing association by sections one and two of this act.

mote the business of this corporation and to injure that of the warehousemen.

Only because they seem to have been ignored we repeat some of the first principles which control and which have been so frequently expressed in varying language:

[2] In *Town of Danville* v. *Pace*, 25 Gratt. (66 Va.) 11, 18 Am. Rep. 663, it is said that "it must be conceded" that "the legislative usurpation ought to be very clear, palpable and oppressive to justify the interposition of the judiciary."

In *Button* v. *State Corporation Commission*, 105 Va. 636, 54 S. E. 769, these expressions appear: "Thus, in a government such as ours, of reserved powers, the legislative department acknowledges no superiors, except the Federal and State Constitutions, and its authority to enact laws unless forbidden by one or the other of those instruments in express terms, or by necessary implication, is paramount."

Section 4. All cards or tickets kept, prepared or placed upon tobacco as required herein, shall, for the period of ten days after the delivery of such tobacco, be open to the inspection of any representative of any public tobacco warehouse, or tobacco growers cooperative association during regular business hours and who shall have access to the place where said cards or tickets are kept for the purpose of such inspection.

Section 5. Any person who shall give a fictitious or false name to such warehouseman or cooperative marketing association, or who shall fail to give to such warehouseman or cooperative marketing association the true name of the owner of said leaf tobacco or said person from whom said tobacco was obtained, or said grower and said landlord, upon delivering the same as aforesaid, shall be guilty of a misdemeanor. Any warehouseman or cooperative marketing association who shall fail to comply with any of the provisions of this act, or who shall deny to any such representative the privilege of such inspection or access, as provided in section four, shall be guilty of a misdemeanor. Any warehouseman or cooperative marketing association who shall buy or sell tobacco as above set forth, knowing that the name in which said leaf tobacco is sold, or any name given pursuant to the provisions hereof, is false or fictitious, shall be guilty of a misdemeanor.

Section 6. Any person guilty of a misdemeanor under the provisions of this act shall be punished by a fine of not less than fifty dollars nor more than five hundred dollars.

Section 7. The term "warehouseman" as used in this act is hereby defined as any person, firm or corporation engaged in the business of selling leaf tobacco at auction, for a commission or for any other consideration.

Section 8. The purpose of this act is to prevent frauds in the handling and sale of leaf tobacco.

[3-7] It must be observed that when the State Constitution is under consideration, it must be shown that there is some inhibiting constitutional limitation, for in the absence of such a limitation there is none upon the power of the General Assembly. By contrast, of course, the Federal Constitution is the source of power of the Congress of the United States, that being an enabling and not a restraining instrument.

In the case last cited, this is also said in this connection: "These propositions are axiomatic and lie at the very foundation of our institutions.

"As a corollary to the foregoing postulates arises the rule of construction that in a doubtful case it is the province of the courts to resolve all doubts in favor of the constitutionality of the act of the legislature.

" 'Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden.' Cooley's Const. Lim., page 105."

In *Commonwealth* v. *Moore & Goodsons*, 25 Gratt. (66 Va.) 951, 953, this is said: "We can declare an act of the General Assembly void only when such act clearly and plainly violates the Constitution and in such manner as to leave no doubt or hesitation on our minds."

Subject to these sound rules everything else which we may say or fail to say here must be construed.

The questions raised in criticism of this act are not new. Even to list the numerous citations which we find in the briefs would be a mere affectation of industry, and certainly no review thereof is necessary. The contending attorneys rely upon the same general rules and principles which have been repeatedly applied in the State and Federal Courts, and the only undetermined

question, as we apprehend it, is as to their application to the facts of these cases.

It appears that from early Colonial days until now statutes regulating the sale of tobacco have been enacted in the tobacco-growing States, and their validity has generally been accepted. *Gray* v. *Central Warehouse Co.,* 181 N. C. 166, 106 S. E. 657; *Tobacco Growers Co-op. Ass'n* v. *Jones,* 185 N. C. 265, 117 S. E. 174, 33 A. L. R. 231.

There is much in the briefs as to the wisdom, expediency, justice, or injustice, of this particular statute, but these are questions to be determined by the General Assembly, not by this court.

A Missouri statute which made it criminal to keep a place for the sale of shares of stock, petroleum, cotton, grain, provisions or other commodities where not actually paid for and delivered, unless the seller kept a record and delivered a stamped memorandum to the buyer, was attacked in *Broadnax* v. *Missouri,* 219 U. S. 285, 31 S. Ct. 238, 55 L. Ed. 219, and this appears in the opinion:

"We are not prepared to hold that the State in this matter has exceeded the bounds of reason, or has legislated beyond the necessity of the case, or has arbitrarily interfered with the course of business among its people. While it is the duty of the Federal courts, if their jurisdiction be lawfully invoked, to see to it that the constitutional rights of the citizen are not infringed by the State, or by its authorized agents, they should not strike down an enactment or regulation adopted by the State under its police power unless it is clear that the declaration of public policy contained in the statute is plainly in violation of the Federal Constitution. Much may be done by a State under its police power which many may regard as an unwise exertion of governmental authority. But the Federal courts have no power to

overthrow such local legislation, simply because they do not approve it, or because they deem it unwise or inexpedient.

"We could not adjudge otherwise without declaring that the statute was so unreasonable and so far beyond the necessities of the case as to be deemed a purely arbitrary interference with lawful business transactions.

"Much was said at bar about the 'liberty of contract.' In a large sense every person has that liberty. It is secured by the provision in the Federal Constitution forbidding a State to deprive any person of liberty or property without due process of law. But the Federal Constitution does not confer a liberty to disregard regulations as to the conduct of business which the State lawfully establishes for all within its jurisdiction." *Ex parte Settle,* 114 Va. 718, 77 S. E. 496.

[8] That public warehouses are affected with a public interest and hence subject to regulation has not been seriously questioned here since the decision of *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77; nor in England since 1810, when it was so held in *Allnut* v. *Inglis,* 12 East 527. The doctrine was there attributed to Lord Hale. *Nash* v. *Page,* 80 Ky. 539, 4 Ky. L. R. 477, 44 Am. Rep. 490; *Budd* v. *New York,* 143 U. S. 517, 12 S. Ct. 468, 36 L. Ed. 247; *Brass* v. *North Dakota,* 153 U. S. 391, 38 L. Ed. 757, 14 S. Ct. Rep. 857.

Because tobacco warehouses are so affected by this public use, the statutes of Virginia have for many years provided for inspection, weighing, fees to be charged, monthly reports to the Commissioner of Agriculture, and many other details. Code, chapter 58, sections 1348-1399. Being so impressed with a public interest, they may be regulated under the police power.

The very citations made by the learned and industrious counsel deny their contention that this is invalid class legislation. For instance, in their quotation from 6 Ruling Case Law, page 217, section 211, this appears: "It cannot be questioned that the State under its police power has the right to regulate any and all kinds of business to protect the public health, morals and welfare, subject to the restriction of reasonable classification. If a vocation or the mode of exercising it involves injury to the rights of others or is inconsistent with the public welfare, it may be regulated and restrained by the State by the exercise of its police power and this power is not confined to the regulation of those classes of business which are essentially illegal, for it extends likewise to lawful callings. In this connection it has been declared that the right of regulation is an exception to the general rule, that every person has a right to pursue any lawful calling. The power of the legislature to impose restrictions on a lawful calling must be exercised, however, in conformity with the constitutional requirement that such requirements must operate equally upon all persons pursuing the same business or profession under the same circumstances. The constitutionality of a statute cannot be sustained which selects particular individuals from a class or locality and subjects them to peculiar rules or imposes upon them special obligations or burdens from which others in the same locality or class are exempt. Moreover, this right of regulation is determined upon a reasonable necessity for its exercise to protect the health, morals or general welfare of the State, and hence it is if a lawful business is of a beneficial character and not dangerous to the public, directly or indirectly, it cannot be subjected to any police regulation whatever. It is not necessary that it

always affect injuriously the public at large. On the contrary, it may be regulated if it affects injuriously those engaged in it or those brought in direct contact with it, even though its pursuit may benefit generally the public of the State at large."

[9] In 6 R. C. L., page 237, section 227, it is shown that a statute of this character should be maintained if it "have some reasonable relation to the subjects included in such power, and the law must tend in a degree that is perceptible and clear towards the preservation of the public welfare, towards the prevention of some offense or manifest evil, or to the furtherance of some object within the scope of the police power."

The prevention of fraud, deceit, cheating and imposition is certainly within the power. 6 R. C. L., page 208, section 202.

This comprehensive statement, found in *Cofman* v. *Ousterhous*, 40 N. D. 390, 168 N. W. 826, 18 A. L. R. 226, is quite applicable to all of the phases of this question: "A business may be useful, yet the method of conducting it may be conducive of harm; and in the same way there may be inducements to and avenues of fraud in a perfectly legitimate business, or cases in which danger of fraud should be minimized, even though the business may be useful and harmless; and even a useful business may be so affected with a public interest that it may be properly regulated."

Applying these rules to the facts of this case, it appears that the object of the statute is to prevent fraud. It appears that many persons who are members of the cooperative association for marketing tobacco have entered into contracts which bind them to deliver their tobacco to the association for sale. It is a concession in the briefs that many persons thus bound by their contracts were breaking them by refusing to deliver their tobacco to the association, and delivering it

instead to the warehouses, having it there sold and appropriating the proceeds, in clear violation of their contracts. What the statute requires is that one who delivers leaf tobacco to a warehouse shall tell the truth, while the burden put upon the warehouseman is that of disclosing this truth. It is conceded that it has long been a customary practice of the warehousemen in this State and elsewhere, and for the purpose of identifying tobacco, to place the name of the owner thereof upon the tobacco so brought to the warehouse for sale at auction. We assume that this practice is for their own protection. When one delivers tobacco to a warehouse for sale and refuses to give his name, or gives a fictitious name, or refuses to disclose the facts required by the act, his purpose must be construed to be sinister, and there is a fair inference that he designs to accomplish some fraud upon his landlord, his creditor, or some other to whom he is under obligation to deliver his tobacco.

In the *Motley Case* it is shown that, knowing the producer of the tobacco and having as a dealer bought it, the warehouseman placed a fictitious name, George Cox, on it. Quoting from the brief of counsel for *Motley*: "The plaintiffs in error, being the owners of this pile of tobacco and intending to resell the same, placed a ticket on it bearing a fictitious name as is the universal custom in such cases, in order that the tobacco might be sold on its *merit* and without prejudice, because it had been bought in and was owned by the plaintiffs in error. This information was voluntarily given by the plaintiffs in error to an 'inspector' employed by the Association, who was 'in their house that day' in the discharge, as he admitted, of his 'special duty' to 'try to stop violations of the contract,' and to 'see that this 1923 law was complied with.'"

[11, 12] The statute was adopted to prevent fraud, and if there had been a universal custom of warehousemen to indulge in such subterfuges whereby frauds were promoted, then it is manifest that the occasion had arisen for the State to intervene to prevent them. It is said by the learned counsel for the warehousemen that it is "pertinent and proper for the court in this case to inquire into the true purpose of the act in question and ascertain whether it is a valid exercise of the police power of the State, or whether it is in reality 'an arbitrary interference with private business,' or whether it imposes 'unusual and unnecessary restrictions' upon a lawful occupation, or 'invades property rights.'" Responding to those inquiries, we have no doubt whatever that it is a valid exercise of the police power; that it is not an arbitrary interference with private business; indeed the statute recognizes and accommodates itself to the customary methods of such business, namely, the identification of the specific piles of tobacco by the name of the true owner. That this invades no property rights is apparent.

In this discussion, the same attorneys quote this from one of the addresses of President Wilson: "You must see to it that your law does not take sides—and that is a Jeffersonian principle. Not that the law should interfere to ease the strain, but to prevent an unmanly advantage. Law is your umpire; it must not go into the ring until one or the other opponent hits below the belt. Law does not object to blows, but it objects to fraudulent or dirty blows. It insists that the contestants be manly, sportsmanlike, righteous, courteous. Its duty is fulfilled when it has enforced the rules of the game, not when it has entered and taken part in the game."

Applying these expressions to the existing situation,

is it not manifest that when the warehouseman actively aids the grower who is a contract breaker in the perpetration of a fraud either upon his fellow members and the association or upon any other, they do the very thing which is there condemned—that is, they conspire and hit below the belt? Is the law to be criticized when it condemns this as a "fraudulent and dirty" blow? That it is the antithesis of manliness, sportsmanship, righteousness and courtesy is obvious. This being shown, the occasion arose which required the law first to devise and then to enforce proper rules for that game. Certainly those rules, which ought not to need statutory expression because they are already sanctioned by the human conscience, need no defense. If there has been an accepted business rule under which warehousemen justify themselves in thus using fictitious names and in this way conspiring with contract breakers to deceive and defraud others, the time has come when the State, in the exercise of its police power, should repeal that pernicious rule; and this is one, if not the chief purpose of the statute.

As an indication of how far the courts have gone in maintaining such public regulations, the case of *People* v. *Beekes Dairy Co.*, 222 N. Y. 416, 119 N. E. 115, 3 A. L. R. 1260, note, is interesting. There it is held that a corporation may be required to give bond to pay for purchases made, or to satisfy a State commissioner of its solvency, as a condition precedent to securing a license to engage in the business of purchasing milk and cream. The case follows the general rule which is stated in the note. That general rule, supported by a wealth of authority, is that since the State may regulate any business, however lawful in itself, which may be so conducted as to become the medium of fraud and dishonesty, therefore the requirement of a bond to secure creditors

of the business against financial loss is a valid enactment, if the requirement is based upon reasonable grounds and is not essentially arbitrary. *Rosenthal* v. *New York*, 226 U. S. 260, 33 S. Ct. 27, 57 L. Ed. 212, Ann. Cas. 1914 B, 71; *Kidd D. & P. Co.* v. *Musselman Grocery Co.*, 217 U. S. 461, 30 Sup. Ct. Rep. 606, 54 L. Ed. 839.

This statute comes well within these rules. The constitutional limitations, State and Federal, are ordained for the preservation of substantial rights, but they cannot be successfully invoked for the support of unethical business practices.

[13, 14] 2. The contention that the statute violates clauses 12 and 18 of section 63 of the State Constitution is unsound. Those inhibitions are, that no local, special or private law shall be enacted which regulates labor, trade, mining or manufacturing, or the rate of interest on money, or to grant to any private corporation, association or individual an especial or exclusive right, privilege or immunity.

In *Strawberry Hill Land Corporation* v. *Starbuck*, 124 Va. 71, 97 S. E. 362, it is said: "If the statute applies throughout the State and to all persons and property within the class specified, and the classification is reasonable and not arbitrary, such a statute is not special, but general." ·

This statute does apply throughout the State and to all persons and property within the specified class, namely, to all growers and dealers in leaf tobacco, to all tobacco warehouses and to all associations, organized for the marketing of such tobacco. It could not intelligently or appropriately be applied to any others because no others are within that general classification. The same idea is expressed in *Budd* v. *Hancock*, 66 N. J. L. 133, 48 Atl. 1023, thus: "A law is special in a constitu-

tional sense when by force of an inherent limitation it
arbitrarily separates some persons, places or things from
those upon which, for such separation, it would operate.''

In *Martin's Executors* v. *Commonwealth*, 126 Va. 603,
102 S. E. 77, 724, involving the West fee bill, Kelly, P.,
said this: ''They (constitutional limitations) are in-
tended primarily as a check upon the intentional exer-
cise of legislative power conferring special privileges
and immunities, or special restrictions and burdens,
upon particular persons or localities to the exclusion of
other persons or localities similarly situated  *  *.  It
follows, therefore, that if a law bears on its face no evi-
dence of an exclusive or discriminating purpose, it is
*prima facie* valid.''

And in the same case this appears: ''Constitutional
prohibitions against special legislation do not prohibit
classification.  A general law in its simplest form em-
braces all persons and places within the State, but vary-
ing circumstances often render it impossible to apply
the same rule everywhere and to everybody.  But the
classification must not be purely arbitrary.  It must be
natural and reasonable, and appropriate to the oc-
casion.''

We conclude then that these clear definitions show
that the act here attacked is general, not special; that
the classification is neither arbitrary nor unreasonable;
and we are sure that it is supported by the principles
which have been stated.

[15] 3. It is said that the act violates the fourth
amendment of the Federal Constitution and section 10
of the Virginia Bill of Rights, prohibiting general search
warrants.  We are unable to appreciate this point.  We
find nothing in the act about general search warrants.
It requires the placing of tags upon the several piles of to-
bacco by the warehouseman, identifying the owner and

the grower, so far as is possible. The warehousemen conduct public auction sales, and this of course implies that all who will may come. To say that any special privilege is conferred upon those who are expressly permitted to read these tags, when it is obvious that any one who goes may also read them, appears to be a contradiction in terms. By the habit and custom of the business similar information is accessible to all because they can read as they run. The additional permission to examine these tags for ten days thereafter makes more effective a regulation which is reasonable and is not a general search warrant, is within the police power of the State for the preservation of the substantial rights of all interested, and constitutes no appreciable hardship upon the warehouseman. Indeed, without the statute, in case of legal controversy, the courts doubtless also have the power to require the production of this as well as of all other documentary evidence pertinent to such controversy. *St. Joseph* v. *Levin*, 128 Mo. 588, 31 S. W. 101, 49 Am. St. Rep. 577.

The privileges granted by the act seem to us to have no relation whatever to general search warrants for the detection of crime.

4. In the *Motley Case*, as has been shown, it is conceded that a fictitious name was placed upon a pile of tobacco in the warehouse, and for this offense against the statute, which was also clearly proved, the conviction ensued.

It is also claimed that the court misconstrued the statute because of the proviso in section 2, "provided, however, that this section shall not apply to licensed leaf tobacco dealers offering for resale tobacco once sold upon the warehouse floor, and with respect to which provisions of this act have previously been complied with." The contention is that as the Motley com-

pany was also a dealer in tobacco, it follows that the provisions of the act do not apply.

[16] It is observed, first, that the proviso is limited to section 2 and does not apply to any other section of the act. It does not purport to relieve the warehouseman of his obligations under any of the sections of the act. Notwithstanding the proviso, it is still true, under section 1, that it is the duty of the warehouseman to keep a true record; and it is also his duty, under section 3, to display upon tobacco offered for sale the ticket or card showing such record so required by section 2; and it is also true, under section 5, that the warehouseman who buys or sells tobacco, as set forth in the act, knowing that the name used is false or fictitious, is guilty of a misdemeanor. The proof here is that the false name of George Cox was put upon this pile of tobacco deliberately. If the proviso should be construed in accordance with this contention, the whole purpose of the act will be defeated and its requirements easily evaded. The true construction of this act, considered in its entirety, requires frankness and publicity of the warehouseman at all stages of the transaction, and he cannot escape those requirements simply because he is likewise a dealer. The obligations so clearly imposed upon the warehouseman as such cannot be thus evaded.

[17] In the *Reaves Case*, it is shown that an agent of the cooperative association was denied permission to read the tags upon the piles of tobacco in the warehouse being offered for sale. That this is a clear violation of the statute which we hold to be valid has already been sufficiently indicated.

While expressions are found here and there in the cases which if read casually may appear to be inconsistent with some of these conclusions, they are not in fact so, and this will appear when the context and the pre-

cise statutes then being construed are examined. The conclusions here stated are based upon sound reason and are consistent with well established principles, among which are, that public warehouses are affected with a public interest; that a classification based upon reason is valid; and that statutes for the promotion of the general welfare, including those for the prevention of fraud, are within the police power. Numerous decisions of the Supreme Court of the United States, a few of which have been cited, establish and enforce these principles.

[18] It may be likewise unnecessary to repeat this, but as similar questions are constantly presented, we say again, that it is insufficient merely to suggest the unconstitutionality of statutes, because there is always the presumption that they are valid, and the burden is upon one who assails it to show its invalidity to the impartial mind; and every fair doubt must be and should always be resolved in favor of its validity.

*Affirmed.*