# Richmond

## BOARD OF SUPERVISORS OF KING AND QUEEN COUNTY v. W. S. COX, ET ALS.

January 26, 1931.

Present, Prentis, C. J., and Campbell, Holt, Epes, Hudgins, Gregory and Browning, JJ.

*Edwin H. Gibson, Assistant Attorney-General, J. D. Mitchell* and *W. D. Evans,* for the plaintiff in error.

*Chas. S. Smith, Jr.,* and *Leon M. Bazile,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The school board of King and Queen county presented to the board of supervisors of that county an application, addressed to the State Board of Education, for the purpose of borrowing $5,000.00 from the literary fund of the State. The application disclosed that the $5,000.00 was needed by the county school board in order to build a new school building, or to remodel, or to make additions to, the present school building at Shanghai, in the Buena Vista district of the county. It was proposed to repay the loan in fifteen equal annual installments with interest payable semi-annually, in accordance with the regulations of the State Board of Education. The board of supervisors, on February 5, 1930, approved the application to borrow the amount applied for from the literary fund of the State. At the same meeting of the board of supervisors, an order was entered which provided that in each year during the life of the loan, at the time it made its regular levies, it would make a levy in Buena Vista district, in the county, for the purpose of repaying the loan and the semi-annual interest.

At a later meeting of the board of supervisors held on April 23, 1930, the citizens of the county were given an opportunity to be heard regarding the annual budget for the county, and also to be heard regarding the additional levy, contemplated to be made, of ten cents on the $100.00, which increased the local levies to that extent. The additional increase of ten cents was to be used in repaying the contemplated loan from the literary fund. A majority of the citizens present expressed themselves as being opposed to the increased levy, but the board decided to make the additional levy for the purpose of repaying the loan and entered an order to that effect. Twenty-six freeholders, under the statute, requested the Commonwealth's attorney of the county to appeal to the circuit court of the county from that part of the order of the board which provided that an additional levy of ten cents would be made to repay the loan.

On June 10, 1930, the appeal was heard and decided by the Circuit Court of King and Queen county. The court held by its order: " * * * that under section 115-a of the Constitution said levy of an additional ten cents on $100.00 is unauthorized without an election, it is considered by the court that said levy of an additional ten cents cannot be laid in Buena Vista district of said county * * *." It is from this order of the Circuit Court of King and Queen county that the board of supervisors applied for and obtained a writ of error.

There are two preliminary questions raised by counsel for the freeholders, which should be disposed of before we undertake to decide the vital issue in the case.

Counsel for the freeholders make the point that the style of the case should be "board of supervisors of King and Queen county, appellants, and Honorable J. Douglas Mitchell, Commonwealth's attorney of King and Queen county, appellee."

█ Without entering into any lengthy discussion of this point, we are of opinion that the real interested parties to this litigation in this court are the board of supervisors on the one side, and the twenty-six freeholders on the other. The statute required the Commonwealth's attorney to appeal from the order of the board of supervisors to the circuit court, if requested so to do by more than six freeholders. The request was made and he did appeal on their behalf. The appeal was properly perfected and the interests of the freeholders safeguarded and preserved. The Commonwealth's attorney has performed all that the statute required of him, and he has no further interest in the matter as a party.

█ Counsel for the freeholders contend that the order of the board of supervisors is void because it did not have the unanimous approval of the board. It appears that two members approved and one disapproved the additional

levy. They claim that section 2039 (40) of the Code (Michie, 1930) prohibited the board, after April 1, from increasing the budget of the county except by the unanimous approval or vote of the members. The section referred to is one of many sections appearing in chapter 85-a of the Code. (Michie, 1930.) The title of this chapter is "General County Road Law" and the levies, and the increase in the budget therein referred to, concern the levies and the budget regarding county roads. This chapter does not apply to school levies and is not applicable to the levy in this case. The school budget is a separate and distinct budget (section 658, Code 1930).

The principal question in this case is whether the school board of King and Queen county is permitted, under the Constitution and the Acts of the General Assembly, to borrow $5,000.00 from the literary fund, which is under the custody and supervision of the State Board of Education, for the purpose of building, remodeling, or making additions to a schoolhouse in that county without first holding an election and procuring a majority vote of the qualified voters in favor of securing the loan.

It is conceded, for the purpose of deciding this question, that unless section 115-a of the Constitution applies in this case, an election and a majority vote of the qualified voters is not necessary in order for the county school board to borrow from the literary fund.

The constitutional provisions, which are pertinent to the main question to be decided, are embraced in article 9, and are as follows: Section 129 provides that "the General Assembly shall establish and maintain an efficient system of public free schools throughout the State."

Section 130 provides that the supervision of the school system shall be vested in a State Board of Education.

Section 132 defines the powers and duties of the State Board of Education. Among other things it provides that

"it shall have the management and investment of the school fund under regulations prescribed by law * * *."

Section 133 provides for school districts and school trustees. "The supervision of schools in each county and city shall be vested in a school board, * * *."

Section 134 creates the literary fund. "The General Assembly shall set apart as a permanent and perpetual literary fund, the present literary fund of the State; the proceeds of all public lands donated by Congress for public free school purposes; of all escheated property; of all waste and unappropriated lands; of all property accruing to the State by forfeiture, and all fines collected for offenses committed against the State, and such other sums as the General Assembly may appropriate."

Section 135 is as follows: "The General Assembly shall apply the annual interest on the literary fund; that portion of the capitation tax provided for in the Constitution to be paid into the State treasury, and not returnable to the counties and cities; and an amount equal to the total that would be received from an annual tax on the property of not less than one nor more than five mills on the dollar to the schools of the primary and grammar grades, for the equal benefit of all the people of the State, to be apportioned on a basis of school population; the number of children between the ages of seven and twenty years in each school district to be the basis of such appropriation. And the General Assembly shall make such other appropriations for school purposes as it may deem best, to be apportioned on a basis to be provided by law."

Section 136, provides that "each county * * * is authorized to raise additional sums by a tax on property, subject to local taxation, not to exceed in the aggregate in any one year a rate of levy to be fixed by law, to be apportioned and expended by the local school authorities of said counties * * * in establishing and maintaining

such schools as in their judgment the public welfare may require * * *. The board of supervisors of the several counties * * * shall provide for the levy and collection of such local school taxes."

The General Assembly in 1928 revised, consolidated, amended and codified the school laws and certain laws relating to the State Board of Education. Acts 1928, chapter 471. The new school code thus arrived at is codified as sections 611 to 718, inclusive, in Michie's Code of 1930. The act was approved on March 26, 1928. The effect of the act is to entirely supersede the school law as embodied in these sections existing at the time of the passage of the 1928 act.

■ The General Assembly, through the enactment of the school code, clearly intended to establish the policy and laws of the State respecting the free school system of the State.

■ The sections of the school code which have any relation to the subject under discussion will be briefly referred to. It will be observed by reference to them that the act makes provision for two separate and distinct kinds of loans for building schoolhouses. First: loans from the literary fund, which do not require a vote of the people, and second, loans from other sources realized from the sale of bonds, which do require a vote of the people. It is quite significant that these two general plans for financing the building of schools are outlined in the school code in detail. Sections 636 to 645, inclusive, are the statutes which provide for literary fund loans and there is no requirement in those sections that an election and vote shall be had in order for a local school board to borrow from the literary fund.

On the other hand, with reference to debts to be contracted by counties for building schoolhouses, in the form of bond issues, by which it is contemplated that the money

will be derived from sources other than the literary fund, there appears the express provision that an election shall be held and a majority vote obtained in favor of such a bond issue, as a condition precedent to the issuance of bonds. This second plan for financing the building of schoolhouses is embodied in sections 673, 674, 674-a, 674-b, 674-c, 674-d, 674-e and 674-f.

In considering this case and in construing the school code and the Constitution we must keep in mind the two separate and distinct plans outlined in the school code.

The General Assembly of 1928, by its enactment, provided in sections 611 and 612 for the establishment and management of the public school system and placed the management in a State Board of Education, a Superintendent of Public Instruction, division superintendents of schools, county school boards and city school boards. The general supervision of the school system was, by the act, vested in a State Board of Education.

Following the relevant constitutional provision, the General Assembly enacted section 632, which provides that there shall be set apart as a permanent and perpetual literary fund, the present literary fund, the proceeds of all public lands donated by Congress for public school purposes, of all escheated property, of all waste and unappropriated lands, or all property accruing to the State by forfeiture and all fines collected for offenses committed against the State, donations made for the purpose, and such other sums as the General Assembly may appropriate. The same shall be known as the literary fund, and shall be invested and managed by the State Board of Education. The principal of the said fund shall always remain unimpaired and entire, and the annual income arising therefrom shall be dedicated exclusively to the support and maintenance of public schools. The fines collected are directed to be paid into the treasury and on warrant of the comptroller they shall

be transferred to the credit of the literary fund and shall be used for no other purposes whatsoever. And then it was provided, in section 633, for the investment of the capital and unappropriated income of the literary fund.

Under the first plan for financing school buildings with money borrowed from the literary fund, the following sections of the school code apply.

By section 636, the State Board of Education is expressly granted the power to loan to the school board of the several counties and cities money belonging to the literary fund and in hand for investment for the purpose of erecting or enlarging schoolhouses in such counties or cities, and under section 637, it is provided that the State Board of Education shall provide for an equitable distribution of the funds loaned from the literary fund among the several counties and cities.

The county and city school boards, under section 638, are expressly granted the authority to borrow from the literary fund, provided they make a formal application setting forth certain information. The approval of the voters in an election is not required by this section. Under section 640, this application is submitted to the Attorney-General for his approval and then it is passed along to the State Board of Education for its approval. Under section 642, after the approval of the application by the Attorney-General and State Board of Education the State Board is granted express authority to make the loan provided it does not exceed $25,000.00, and provided it shall not exceed two-thirds of the cost of the schoolhouse. It is further provided that no loan shall be made to aid in the erection of any schoolhouse or any addition thereto to cost less than $500.00, and further that no loan shall be made in any case in which the payment of the same with interest would, in the judgment of the State Board of Education, entail too heavy a charge upon the revenues of the county or city.

■ It is quite significant, that in making a loan of this kind the propriety of making it is left entirely to the judgment and discretion of the State Board of Education, and the local school board.

The rate of interest under section 643, on such loan, is fixed at four per cent and is payable semi-annually and the principal is payable in fifteen annual installments and shall be evidenced by bonds or notes payable to the Commonwealth of Virginia, for the benefit of the literary fund.

Section 644 provides that the board of supervisors in counties and the councils in cities, in which school boards have borrowed funds from the literary fund, shall include in the county or city levies, or appropriate sufficient funds, as the case may be, to meet its liabilities on such contracts.

Section 645 provides that the loan made under this chapter shall constitute a specific lien on the schoolhouse and addition thereto, for the erection of which such loan has been made, as well as the lot where the buildings are situated. All such buildings shall be kept fully insured for the benefit of the literary fund and the policies deposited with the State Treasurer.

The annual interest on the literary fund is expressly made a part of the school fund, under section 646.

Under the second plan for financing school buildings, by which a vote of the people is required, detailed provision is made for these general loans from sources other than the literary fund. In section 673 authority is granted to the counties to make these general loans for this purpose and to issue bonds therefor, provided the proposal has been approved by the board of supervisors, the judge of the circuit court and a majority of the qualified voters of said county in an election held for the purpose. These bonds are issued on the credit of the county and the State Board of Education has nothing to do with the transaction. It has no supervision whatever over such a loan. The suc-

ceeding sections, 674, 674-a, 674-b, 674-c, 674-d, 674-e and 674-f, deal entirely with bonds issued for the purpose of erecting schoolhouses and which have been approved by the majority of the qualified voters of a county. These sections have no bearing on loans from the literary fund.

Under article 7 of the Constitution is found section 115-a, the constitutional provision which is invoked in this case as a prohibition against the loan proposed to be made by the State Board of Education to the school board of King and Queen county.

It will be observed that article 7, which embraces section 115-a of the Constitution, relates solely to the "Organization and Government of Counties," while article 9, under which the constitutional provisions for public schools appear, relates solely to "Education and Public Instruction." These two general divisions appear in the Constitution.

Section 115-a, is as follows:

"No debt shall be contracted by any county, or by or on behalf of any school board of any county, or by or on behalf of any school district in any county, except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county, or any district of any county, or any school board of any county, or any school district in any county, to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county, board or district for the then current year, or to redeem a previous liability, unless in the general law authorizing the same provision be made for the submission to the qualified voters of the proper county or district, for approval or rejection, by a majority vote of the qualified voters voting in an election on the question of contracting such debt; and such approval shall be a prerequisite to contracting such debt. No script, certificate or other evidence of county or district indebted-

ness shall be issued except for such debts as are expressly authorized in this Constitution or by the laws made in pursuance thereof."

It is contended by counsel for the freeholders that the loan proposed to be made in this case from the literary fund to the county school board of King and Queen county, can only be made after it has been submitted to the voters and has been approved by a majority vote; that the amendment to the Constitution, section 115-a, applies to loans from the literary fund and that the loan in question not having first been approved by a majority vote in an election held for the purpose, in accordance with section 115-a, is prohibited by the express terms of the amendment.

We cannot concur in this view of the case. We are of opinion that the amendment, section 115-a, has no application whatever to literary fund loans to local school boards.

We do think, however, that the amendment applies to debts contracted by a county for building schoolhouses, which are to be incurred by or through a bond issue for the purpose, and which are embraced in the "second plan," outlined in the school code, for financing the building of schoolhouses, and provision for which is expressly made in sections 673 to 674-f of the school code.

Section 115-a of the Constitution confers the power on county school boards to borrow money or contract a debt, only after the question has had the approval of the qualified voters in an election for the purpose. In view of this section of the Constitution, the General Assembly passed the necessary legislation providing the means for carrying into effect this section of the Constitution so far as public schools are concerned. Those legislative acts, section 673 to 674-f, inclusive, provide in detail for general loans to local school boards, but as a prerequisite to making such loans they must have the approval of a majority of the

voters. The nature of the debt which may be contracted by a school board with the approval of the voters and embraced in section 115-a of the Constitution, and in the Acts of the General Assembly, sections 673 to 674-f, inclusive, is entirely different from the loans made from the literary fund. In the former case, an election and bond issue are contemplated. The money derived from a sale of the bonds is placed in the exclusive control of the local school board. The State Board of Education has nothing to do with it. In the latter case the State Board is given wide authority. It has the discretion to make the loan or to refuse to make it and the plans for the school building must have its approval. No election or bond issue is contemplated in making loans from the literary fund.

Section 632 of the school code, in accordance with Constitution, section 134, defines the sources from which the literary fund is derived, and section 633, in accordance with Constitution, section 132, places this fund under the control and supervision of the State Board of Education. The mandatory duty is imposed upon the State Board to invest the capital and unappropriated income of the literary fund. The thought running through the several constitutional provisions and the school code is that the literary fund shall always remain intact and that it is devoted and dedicated exclusively to school purposes.

The major portion of this fund arises from forfeitures and fines collected through the various courts in the counties and cities of the State. The counties and cities are acting, in the collection of this portion of the fund, as agencies of the State and the theory of the system is that the money so derived should go back to those counties and cities in the form of loans, equally distributed among them, for educational purposes. The school boards of the counties and cities in procuring loans from the literary fund for building schoolhouses are likewise acting as agen-

cies of the State in assisting in carrying out the mandatory duty imposed by the Constitution that an efficient free school system shall be established and maintained.

The Constitution and the General Assembly place the control and supervision of the literary fund in the hands of the State Board of Education with the direction that the board shall preserve and perpetuate it and invest it. The Constitution and the General Assembly have likewise placed the school system under the supervision of the State Board of Education and the local school boards of counties and cities. If the building of schoolhouses in a county depends in all cases upon a vote of the people, then to that extent certainly they are supplanting the State Board of Education.

Education is primarily a State function, and the State possesses the power by requiring the levy of a school tax in a county or city, to perform this function. In causing a school tax to be levied in a county, the assent of the people is not required. All school requirements, so far as the State is concerned, are worked out by the State Board of Education. This board is answerable only to the General Assembly. However, the General Assembly has made provision for counties and cities to supplement the funds provided by the State for school purposes, if a county or city deems the State funds insufficient. If a county or city desires a better schoolhouse than the State provides, it may raise money, under the statute, for a more elaborate building provided the voters assent.

The Constitution imposed the mandatory duty on the General Assembly to establish and maintain the public school system, and school buildings are essential to that system. The principal, if not the only, method available to the General Assembly, by which it can provide for the construction of school buildings, is through the loans from the literary fund for that purpose. The State Board of

Education and the local school boards are the agencies through which it can and does provide these schoolhouses. If section 115-a is to be construed as requiring the approval of the voters before such buildings can be constructed with these funds, the practical effect will be to deny to the General Assembly, the principal, if not the only, means it has of carrying out or performing the mandatory duty imposed on it. Current revenues of the State have never been used for such purpose.

■ Under the school code, the General Assembly, through its agencies, the State Board of Education and the local school boards, has the power to and does provide for schoolhouses from the literary fund, when it is considered necessary, and it can compel the levy of a tax to reimburse the literary fund. This, of course, is the case, only in the event the county fails to provide such buildings by general bond issues or otherwise, and is in the nature of an involuntary obligation imposed on the county by the General Assembly. Such action is in discharge of the mandatory duty imposed by the Constitution on the General Assembly to establish and maintain an efficient system of free schools. On the other hand, if the county school board prefers, or if it proposes additional or more elaborate school buildings than may be provided from the literary fund, the qualified voters may approve a general bond issue and provide the funds for additional expenditures. In other words, the obligation on the county to repay a literary fund loan for schoolhouses is in the nature of an involuntary one, imposed by the General Assembly in carrying out the mandatory directions of the Constitution, while its obligation to repay a bond issue loan for schoolhouses, the proceeds of which have been used in lieu of, or to supplement, the funds provided by the General Assembly, is a voluntary obligation brought about by the approval of the voters. It is only to the debts or loans of the volun-

tary class that section 115-a of the Constitution is directed.
To hold otherwise, would in effect be to construe section
129 of the Constitution as imposing on the General Assembly the duty to provide schools, and section 115-a as
denying it the power to perform that duty.

█ No single section of the Constitution should be
construed alone, but consideration given to the instrument
as a whole, and, so far as possible, all provisions harmonized.

█ In construing the school code and section 115-a
of the Constitution, weight should be given to the legislative
construction of these provisions. Section 115-a was not
included in the report of the commission which recommended the proposed changes in the Constitution. It
originated in the General Assembly and, after approval in
the session of 1928, it was submitted along with the other
amendments for ratification by the people of the State.
At the same session of the General Assembly sections 611
to 718, inclusive (known as the school code), were enacted
into our law. In several sections of the school code provision was made for the contingency of the amendments
being ratified or rejected. Section 612 (Acts 1928, chapter
471, section 1) begins with this statement: "If and when
section 130 of the Constitution is amended * * *;"
section 630 (Acts 1928, chapter 471, section 1): "* * *
In the event that section 131 of the Constitution should be
amended * * *;" and section 649 (Acts 1928, chapter
471, section 1) begins thus: "Unless sections 132 and 133
of the Constitution of Virginia are amended." It will be
observed in referring to the original act that sections 632
to 645 (Acts 1928, chapter 471, section 1), inclusive, the
sections of the school code which authorize the lending of
money from the literary fund to school boards and conferring power upon the school boards to borrow it, that
there is no reference in those sections to the contingency
that section 115-a may or may not be ratified. From

this it is clear that the General Assembly did not intend that a vote of the people should be necessary in order for a county school board to borrow from the literary fund, else the contingency would have been provided for in those sections which provide for loans from the literary fund to school boards, just as the contingency was taken care of in sections 612, 630 and 649.

It was not the purpose or intention of the General Assembly in submitting section 115-a of the Constitution to the people, nor was it the intention of the people in ratifying the amendment, to hamper and disrupt the educational activities of the State by requiring a vote of the people on loans from the literary fund. Many of these loans, no doubt, are small and it would seriously embarrass the school system if it were necessary to incur the expense and delay of an election in order for one agency of the State, a local school board, to borrow from another agency, the State Board of Education. For instance, an election would not be justified in order to borrow from the literary fund through the State Board such a small sum as $600.00, for repairing a school which possibly might have been damaged by fire. On the other hand, suppose the election should be unfavorable to the loan, and there be no general funds available, is the county to be left without a schoolhouse?

Section 115-a, having been submitted to the people by the General Assembly of 1928, and it having enacted the school code at the same session, it is obvious that the General Assembly did not contemplate that there was any conflict between the provisions of 115-a and the school code; and the people, in voting on the amendment, are presumed to have had knowledge of the simultaneous enactment of the school code and to have likewise construed 115-a as not in conflict therewith.

It would seem obvious that if the General Assem-

bly, in submitting section 115-a of the Constitution to the people, had intended its adoption as a repeal of those provisions of the school code which permit loans from the literary fund to local school boards without a vote of the people in the counties, or if it had intended it to limit such loans in any way, other than they are limited in the school code, a clear express provision to that effect would have been embraced in the constitutional amendment.

Numerous authorities could be cited in support of the rule that contemporaneous legislative construction of a doubtful provision is entitled to great weight in its construction. In 6 R. C. L., section 59, we find this statement of the rule: "In determining the constitutionality of statutes great weight has always been attached to contemporaneous exposition of the meaning of fundamental law * * *." And again in 6 R. C. L., section 60, this is stated: "The principle of contemporaneous construction may be applied to the construction given by the legislature to the constitutional provisions dealing with legislative powers and procedure. Though not conclusive, such interpretation is generally conceded as being entitled to great weight and should not be departed from unless manifestly erroneous. * * *."

In the case of *Blake* v. *Marshall*, 152 Va. 616, 148 S. E. 789, 791, this is announced: "It is of course fundamental that the General Assembly has the authority to enact any statute which is not prohibited by the Constitution; that the presumption is in favor of the validity of the statute; and that the burden of showing that it contravenes the Constitution is upon those who aver that it does. Even where there seems to be a conflict, this should be reconciled, if it is possible to uphold the statute in whole or in part. *Reaves Warehouse Corp.* v. *Commonwealth*, 141 Va. 199, 126 S. E. 87; *Tobacco, etc., Association* v. *Warehouse Co.*, 144 Va. 459, 132 S. E. 482.

"The contemporaneous construction placed upon constitutional limitations is significant, even though not always decisive. We find that at the time of the adoption of section 175 the framers of the Constitution used no language indicative of any purpose either to nullify the existing valid statute * * * it is certainly improbable that had such purpose existed it would not have been expressed, or at least indicated by some appropriate language in the Constitution.

"The General Assembly was oblivious of any such conflict, because in the general revision immediately following the adoption of the Constitution this statute was left unchanged. Those then interested failed to perceive any conflict, irreconcilable or otherwise."

■ An elementary rule of construction is that all related provisions of a constitution or statutes must be considered and read together in construing one provision. Several related provisions of our Constitution are mandatory. For example, section 129 of the Constitution requires that the General Assembly *shall* establish and maintain the school system. Again, section 130 requires that the school system *shall* be vested in a State Board of Education. In section 132, it is provided that: "The duties and powers of the State Board of Education *shall* be as follows:"

Section 134 requires that the General Assembly *shall* set apart as a permanent and perpetual fund, the literary fund.

Section 135 requires that the General Assembly *shall* apply the annual interest on the literary fund to the primary and grammar grades of schools, and section 136 requires that primary schools *shall* be maintained.

It appears that the General Assembly, in obedience to the mandatory provisions of the Constitution, has established a State wide, efficient, free school system. It enacted a comprehensive school code and created a State Board of Education to carry through the plans for the establishment

and maintenance of the school system. The literary fund, which is the property of the Commonwealth under the control of the General Assembly, was placed at the board's disposal for that purpose, and it was directed to use the fund in carrying out the directions of the Constitution and the General Assembly, in a certain definite and specific way. The only limitation on the use of that fund by the board was that it should not be depleted, but should remain permanent and perpetual and that the income derived therefrom should be dedicated exclusively to public schools. The board was further directed to lend the fund, under certain conditions, to the local school boards for educational purposes, provided that the fund was to be always kept intact.

When the related sections of the Constitution and the pertinent acts of the General Assembly are read and construed together it is not difficult to arrive at the meaning of the constitutional provisions and the intent of the General Assembly. A fair and reasonable construction is the construction which the General Assembly has already placed upon the provisions; that is, that they are in harmony, each with the other; that no conflict exists, and that the local boards can borrow from the fund without first procuring a majority vote of the people.

The public school system has been created and developed by virtue of the several constitutional and statutory provisions. The system is embodied in no single provision. In order to arrive at an understanding of the school system as created and developed, we must read and consider all of the related provisions of the law together and analyze them in a comprehensive manner. In no other way can they be properly construed and applied. When those provisions are considered and construed together, the inevitable result is that section 115-a of the Constitution does not apply to literary fund loans.

On the other hand, if we adopt the construction of section 115-a as contended for by the freeholders without referring to and considering the school code, such construction would result in giving to that amendment such a limited and restrictive meaning that under it alone a school board could not pledge the county's credit and issue bonds for school purposes, even though a majority of the people would be willing to approve the plan, because the means and machinery for obtaining the vote of the people and holding an election are not found in 115-a. Those means are found only in the school code (sections 673 to 674-f, inclusive). In other words, while 115-a provides that an election shall be held, it does not provide how, when, where and at whose expense it shall be held. Complete provision for such an election is found in the school code and in those sections therein where it is contemplated that a school board desires to contract such a debt as is provided for in section 115-a. Every step necessary to be taken is fully provided for.

Again if we construe section 115-a as applying to literary fund loans, it might be ineffectual because the State Board of Education, having supervision of the fund and being vested with a discretion as to whether the loan should be made, could refuse to make the loan, even though it had been approved by the voters. Such a loan might, in the discretion of the State Board, be a too heavy charge on the revenues of the county, or it might result in an unequal distribution of such loans to the several counties and cities throughout the State. In either event, the State Board could withhold the loan.

It is obvious that if section 115-a is construed as applying to literary fund loans, then the relevant sections of the school code would be nullified.

Under article 1, section 14, of the Constitution, no government, separate and independent of the State gov-

ernment, is permitted. County government has been provided for and it is made one of the instruments or agencies through which the State performs its functions of government. It is an arm of the State. A county school board borrowing from the State Board of Education the State's money (literary fund), which has been set apart and devoted to schools, is but a transaction between two agencies of the State concerning the application and use of the State's funds.

On the other hand, debts contracted by a county for building schools, in the form of bond issues, which is the most common form, are not supervised in any manner by the State Board of Education. Such board has no authority to prevent a county contracting such a debt, nor can it prescribe the plan of school buildings which may be constructed with the money so derived. In such a case, the interest paid and the principal repaid are both lost to the county and State forever. It is clear that it was with respect to debts of this nature that the restrictions of section 115-a of the Constitution were intended to be applied.

We have considered the North Carolina cases in which similar provisions of the Constitution and statutes of that State have been construed, and while we have great respect for the authority of the courts of North Carolina and we think those cases support the conclusions reached in this opinion, yet, we believe that the controlling principles which underlie a correct decision of this case may be reached by applying the elementary rules of construction as herein stated.

Through the school code, the General Assembly has made detailed and specific provision, outlining the necessary steps to be taken, for a local school board to borrow from the literary fund without first obtaining the approval of the voters. The General Assembly in enacting the school code

and thereby arranging for local school boards, without the approval of the voters, to borrow from the literary fund, which the Constitution devoted to the commendable purpose of free schools, was but performing its mandatory duty and carrying out a wise and sound public policy.

One consequence of the dissenting view would be that while the counties may not, the cities and towns certainly may, under the statute, have such appropriations from the literary fund for the construction of school houses. We may be perfectly confident that such a discrimination against the counties in the use of the public funds was never contemplated, and that a construction of section 115-a which leads to such a result is unsound.

This opinion is not to be construed as affecting, in any way, the power of the State Board of Education to invest the literary funds in bonds issued by local school boards of counties and cities for the purpose of building schoolhouses, in pursuance of the authority granted in section 633 of the school code.

■ Our conclusion is that the school board of King and Queen county is entitled to borrow the money applied for from the literary fund, provided it has otherwise complied with the law, and that the board of supervisors of that county, under the law, acted within its rights and performed its duty when it, by an order, levied an additional tax of ten cents on one hundred dollars, to repay the loan and interest.

The judgment of the lower court is reversed and final judgment is here rendered in favor of the board of supervisors.

*Reversed.*

EPES, J., dissenting:

I am unable to concur in either the conclusion or the reasoning of the opinion of the court, but shall not enter upon any extended discussion thereof. It seems to me sufficient to say:

Sections 636–645, Va. Code, as enacted by Acts 1928, chapter 471, page 1197, *et seq.*, authorizing and providing for loans to counties and cities from the literary fund, impress upon the obligation assumed by a county or city procuring such a loan every incident of a debt in the ordinary acceptation of the term.

Under section 134 of the Constitution an act of the General Assembly relieving a county or city of the payment of such obligation once it has been contracted by the county or city is null and void.

Section 115-a of the Constitution provides:

"No debt shall be contracted by any county, or by or on behalf of any school board of any county, or by or on behalf of any school district in any county, except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county, or any district of any county, or any school board of any county, or any school district in any county, to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county, board or district for the then current year, or to redeem a previous liability, unless in the general law authorizing the same provision be made for the submission to the qualified voters of the proper county or district for approval or rejection, by a majority vote of the qualified voters voting in an election, of the question of contracting such debt; and such approval shall be a prerequisite to contracting such debt. No script, certificate or other evidence of county or district indebtedness shall be issued except for such debts as are expressly authorized in this Constitution or by the laws made in pursuance thereof."

The fact that a loan from the literary fund is a *debt* seems to me to be beyond question; and the language of section 115-a of the Constitution, I think, is too plain and

comprehensive to admit of circumvention by astute legal refinements.

I am of opinion that such loans from the literary fund are debts within the plain meaning of section 115-a of the Constitution; and cannot be contracted without submission to a vote of the people.

HUDGINS, J., concurs in the dissent of EPES, J.