## Staunton

J. LINDSAY ALMOND, JR., ETC. v. HENRY G. GILMER,
ETC., ET. AL.

September 8, 1948.

Record No. 3424.

Present, All the Justices.

*J. Lindsay Almond, Jr., Attorney General, Kenneth C. Patty* and *Walter E. Rogers, Assistant Attorneys General,* for the petitioner.

*C. O'Conor Goolrick* and *Stuart G. Christian,* for the respondents.

MILLER, J., delivered the opinion of the court.

By resolution adopted April 16, 1947, the Board of Trustees of the Virginia Retirement System agreed to purchase from the State Board of Education five million dollars face value of bonds, notes and other evidences of debt to be issued to and acquired by the State Board of Education for loans to be made by it out of the literary fund to various school boards.

It is contemplated and intended that the trustees will use the reserve assets of the retirement fund to purchase

the securities and obligations issued by the school boards and from them acquired by the State Board of Education. To effect this, the trustees of the retirement fund will make available to the State Board of Education, as trustee and manager of the literary fund, money to lend the school boards. The Board will, by that means, acquire the bonds for the literary fund. They will then be passed on to the trustees of the Virginia Retirement System for the money so available and such trustees will thereafter be the holders of the securities for the purposes of and on the trusts set forth in the Virginia Retirement Act.

Upon being advised of this commitment on the part of the trustees of the Virginia Retirement System to so purchase that amount of securities and believing that the literary fund's current money might be so augmented from the reserve assets of the retirement fund with which it could actually make loans to the school boards, the State Board of Education approved various loans to school boards in excess of four million dollars. When finally consummated, this contemplated transaction would have imposed long-term financial obligations upon the several counties obtaining such loans. That is proposed to be done without submitting the matter to the qualified voters for their approval or rejection.

Such obligations or debts to be so incurred by the respective school boards, which are in fact county obligations and which are ultimately to be held as a part of the retirement fund, will bear interest at three per cent per annum. This conclusively establishes that they are to be bought with the money of the retirement fund only temporarily colored as literary funds for, under existing law, literary funds proper can only be loaned to school boards at two per cent per annum.

Under Code sec. 2672 (20) of the Virginia Retirement Act, as amended, the State Treasurer is made the "custodian of the several trust funds of the Retirement System" and "all payments from said funds shall be made by him on warrant of the Comptroller issued upon vouchers" of the Virginia Retirement Board.

The State Comptroller and the Treasurer were apprehensive of their legal authority to pay to the literary fund for the purchase of such securities money from the State Treasury belonging to the Virginia Retirement Fund. Their apprehension was caused by doubt of the constitutionality in that respect of the recent acts of the General Assembly. These acts undertake to authorize such transactions and payments without the approval of the qualified voters of the respective counties or county districts affected thereby. They declined to make such payments from the treasury and by written communication of April 8, 1948, to the Attorney General of Virginia, requested him to secure an adjudication by this Court of their duties in the premises.

A proceeding by mandamus to determine the proper construction, interpretation or constitutionality of an act of the General Assembly which directs payment of money out of the State Treasury is provided for by Acts of 1944, p. 425. This action was therefore instituted by the Attorney General against the Treasurer and Comptroller to determine the question at issue.

It is insisted by the petitioner that the recent Act of the General Assembly, Acts 1946, p. 522, whereby sec. 18 (appearing as section 2672 (20) in Virginia Code, 1942, Supplement 1946, p. 210) of the Virginia Retirement Act was amended, and the Act of the General Assembly of 1947, Acts 1947, p. 68, which amends sec. 643 of the Code of Virginia (such last mentioned section being a part of the Literary Fund Act), when read together authorize the purchase by the State Board of Education, on behalf of the literary fund, of bonds, securities and evidences of debt of local school boards, and the transfer and sale of the same to the trustees of the Virginia Retirement System contravene no constitutional provision.

On the other hand, it is asserted by respondents that such transaction and loans to the county school boards impose upon the counties involuntary indebtedness; that money must be raised by taxation to pay the annual interest upon such securities and ultimately to pay the principal of

such obligations, and that these obligations constitute long-term debts within the meaning of sec. 115-a of the Constitution and that the contracting of such obligations violates this constitutional provision.

It should also be observed that sec. 134 of the Constitution dedicates the literary fund to school purposes and sec. 135 directs the use of the interest thereon for the same purpose. Yet if this contemplated transaction be consummated, the annual interest to be paid upon these proposed obligations will not go into the literary fund as required of loans of that fund, but will go into the retirement fund.

Thus the question presented is: Can this contemplated transaction and use of the reserve assets of the retirement fund by channeling them into the literary fund and then lending them to the counties as literary funds, when in fact they are retirement funds, be legally consummated without violation of the above provisions of the Constitution?

The pertinent parts of the Retirement Fund Act and the Literary Fund Act, respectively, as amended, are as follows:

Sec. 18 of the Retirement Act: * * * "The Board (trustees of the Virginia Retirement System) may also, in its discretion, invest such trust funds in bonds, notes and other evidences of debt of the school boards of the several counties, cities and towns of the State held in the Literary Fund evidencing loans made from such Literary Fund by the State Board of Education, pursuant to the provisions of sections six hundred thirty-two to six hundred forty-four, both inclusive, of the Code of Virginia, and the State Board of Education is hereby authorized to assign such bonds, notes and other evidences of debt to the Board whenever the Board desires to invest any of such trust funds therein and the State Board of Education consents thereto: and when such bonds, notes or other evidences of debt are so acquired by the Board the same may not be sold or otherwise disposed of except to a State Governmental agency." (Acts 1946, Ch. 309, p. 522, Michie Code, sec. 2672 (20) )

Sec. 643. (Literary Fund Act). "Rate of interest on loans; payment of installments; evidences of debt. All

loans whether made on or before January first, nineteen hundred forty-seven shall bear interest at the rate of two per centum a year, payable annually; provided, however, that after January first, nineteen hundred forty-seven when loans have been approved by the State Board of Education from time to time in such amounts that no sufficient balance shall have been left in the literary fund from which to make additional loans to the school boards of counties, cities and towns making application and qualifying for such loans, then the State Board of Education is authorized in its discretion to fix the rate of interest as low as possible not less than two per centum and not to exceed four per centum a year on such additional loans which may be made by selling the bonds of the cities and counties for which such loans are approved, for investment of the reserves of the Virginia Retirement System in such amount as may be approved by the Virginia Retirement Board in accordance with the provisions of section eighteen as amended, of the 'Virginia Retirement Act', in order to provide additional funds to make loans to the school boards of the several counties, cities and towns for the purposes for which such loans are legally authorized to be made; * * *. The principal shall be payable in annual installments from five to thirty years * * *. Payments of interest and principal shall be made to the State Treasurer and evidence of debt taken for such loans shall be deposited with the State Treasurer and kept by him. * * *" (Acts, 1947, Ch. 27, p. 68.)

The following three constitutional provisions are also pertinent:

Sec. 115-a. "No debt shall be contracted by any county, * * *, or by or on behalf of any school board of any county, except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county, * * *, or any school district of any county, to contract any debt except to meet (1) casual deficits in the revenue, (2) a debt created in anticipation of the collection of the revenue of the said county, board or district for the then current year, (3) or to redeem a previous liability, unless in the general law authorizing the same,

provision be made for the submission to the qualified voters of the proper county or district, for approval or rejection, by a majority vote of the qualified voters voting in an election, on the question of contracting such a debt. No script, certificate or other evidence of county or district indebtedness shall be issued except for such debts as are expressly authorized in this Constitution or by laws made in pursuance thereof."

Sec. 134. "The General Assembly shall set apart as a permanent and perpetual literary fund, the present literary fund of the State; the proceeds of all public lands donated by Congress for public free school purposes; of all escheated property; of all waste and unappropriated lands; of all property accruing to the State for forfeiture, and all fines collected for offenses committed against the State, and such other sums as the General Assembly may appropriate * * *."

Sec. 135. "The General Assembly shall apply the annual interest on the literary fund; * * * to the schools of the primary and grammar grades, for the equal benefit of all the people of the State * * *."

As the trustees of the Virginia Retirement Fund have given their commitment to purchase five million dollars of school board bonds or securities from the literary fund, by this contemplated undertaking the State Board of Education, as trustee for and manager of the literary fund, intends to obligate itself to actually purchase bonds or securities of the school boards, receive the money into the literary fund from the retirement fund with which to consummate such purchase, and as a part of the same transaction pass the bonds and obligations of indebtedness so issued by the school boards on to the retirement fund. By that method it is claimed and asserted that the State Board of Education is using the literary fund to acquire the bonds and securities and therefore lending its funds to the school boards for school purposes. But reduced to its essentials, it is, in fact and reality, the mere channeling of the funds of the Virginia Retirement System into and through the literary fund to the local school boards. To effect such transaction, an attempt is

made to temporarily transfer reserves of the retirement fund into the literary fund so that it may assume the qualities of that fund and be loaned for school purposes. Actually the State Board of Education, by resort to and through the provisions of sections 632 to 646, inclusive, of the Code enacted solely to effect the investment, use and preservation of the literary fund proper, seeks to lend millions of dollars of the retirement fund to the localities for school purposes as if they were literary funds, thereby imposing involuntary obligations and debts upon the counties.

By this method and procedure, on the authority of the decision in the case of *Board of Supervisors* v. *Cox*, 155 Va. 687, 156 S. E. 755, it is sought to escape the prohibition contained in sec. 115-a of the Constitution of Virginia which forbids the incurring by a county of a long-term bonded debt except upon proper referendum.

Upon examination of the provision contained in sec. 115-a forbidding the imposition of long-term indebtedness upon the counties or their school districts without submission of such matter to a vote of the qualified voters, and the requirement of sec. 135 as to the application of interest on literary funds, it is our view that such a transaction and attempted use of the vast resources of the retirement fund for *investment as literary funds* is in violation of the spirit and letter of these sections of the Constitution. It imposes a debt forbidden by the former and directs the payment of interest into a fund not allowed by the latter.

It is appropriate to observe that the case of *Board of Supervisors* v. *Cox, supra*, so heavily relied upon by petitioner as controlling in the present instance even in dealing with investment of actual literary funds lacked unanimity of judicial opinion. There the majority decided only that the State Board of Education was empowered to make long-term loans from and of the *literary fund* to counties or county school boards without first submitting the matter to a vote. In so far as the literary fund was concerned, it having, since its creation in 1810, been dedicated to school purposes and the legislative construction having been that

it could be so used without first resorting to a vote to determine the desire of the electorate affected, a majority of the court was of the opinion that the loan of that fund did not fall within the prohibitive provision of sec. 115-a.

From an examination of the record and briefs in that case, it appears that subsequent to the adoption of sec. 115-a and before institution of that suit which involved a loan to a county school board of some five thousand dollars, about one-half million dollars had been loaned by the State Board of Education from the literary fund to various school boards without first obtaining sanction of the imposition of such burden upon the counties involved by submission of the matter to a vote of the qualified voters. The court was dealing factually with a fund which was at the time of its creation in 1810, as appears from the Acts of the General Assembly, 1809-1810, p. 15, dedicated to school purposes.

Upon the adoption of the Constitution of 1869, this fund which had been of legislative origin, was more basically set apart for its declared purposes. Sections 7 and 8 of Article 8 of that Constitution are in substance and form substantially similar to sections 134 and 135 of our present Constitution. In 1931 when the *Cox Case* was decided, the literary fund had been used exclusively for educational purposes for a period of more than one hundred years.

In 1928, the same year sec. 115-a of the Constitution was adopted, the legislature provided for the literary fund to be loaned for school purposes without the vote of the electorate as a condition precedent. Therefore, at the time of the *Cox Case* decision, sec. 115-a had been given both administrative and legislative interpretation and sanction as permitting the borrowing by the county school boards for periods in excess of one year, and the lending thereof by the State Board of Education without submission of the matter to a vote of the people, of a fund set apart and dedicated for the object contemplated.

In judicially approving such practice, the court limited its decision to the literary fund as clearly appears from these excerpts from that opinion:

"The principal question in this case is whether the school board of King and Queen county is permitted, under the Constitution and the Acts of the General Assembly, to borrow $5000.00 from the literary fund, which is under the custody and supervision of the State Board of Education, for the purpose of building, remodeling, or making additions to a schoolhouse in that county without first holding an election and procuring a majority vote of the qualified voters in favor of securing the loan." (155 Va., at p. 693.)

"The sections of the school code which have any relation to the subject under discussion will be briefly referred to. It will be observed by reference to them that the act makes provision for two separate and distinct kinds of loans for building schoolhouses. First: loans from the literary fund, which do not require a vote of the people, and second, loans from other sources realized from the sale of bonds, which do require a vote of the people." (155 Va., at p. 695).

"On the other hand, with reference to debts to be contracted by counties for building schoolhouses, in the form of bond issue, by which it is contemplated that the money will be derived from sources other than the literary fund, there appears the express provision that an election shall be held and a majority vote obtained in favor of such a bond issue, as a condition precedent to the issuance of bonds." (155 Va., at pages 695, 696).

"No election or bond issue is contemplated in making loans from the literary fund." (155 Va., at p. 701).

In that case the court declared valid and permissive without the vote of the taxpayers mentioned in sec. 115-a, only loans from the literary fund proper. No other funds were involved except those constitutionally and legislatively dedicated to school purposes and from which loans the interest would be paid into that fund. By such use, the literary fund was made a revolving fund for school purposes and the interest on the loans made to the school boards augmented and increased the fund.

The Virginia Retirement System, whose funds are partially contributed by the beneficiaries and held upon and for an entirely different trust and purpose, was not then in existence.

That sec. 115-a applies to and prohibits loans to county school boards when the same are made otherwise than from the literary fund and are not within the express exceptions contained in sec. 115-a such as to meet casual deficits in the revenue, etc., is made abundantly clear by the opinion in *American-LaFrance, etc., Industries* v. *Arlington County*, 164 Va. 1, 178 S. E. 783, 99 A. L. R. 929.

In declaring invalid obligations incurred by the county of Arlington for the purchase of fire equipment which were represented by notes and contracts payable over a term of years, and therefore not within the express exceptions set forth in sec. 115-a or authorized by sec. 2727 of the Code enacted in pursuance of such constitutional mandate, the now Chief Justice Hudgins quotes pertinent parts of sec. 115-a and then says:

"Prior to 1928, there was no limitation upon the General Assembly as to the amount of indebtedness that it, by local bills, or otherwise, might authorize the different counties to incur. The local governing bodies of these political sub-divisions of the State would frequently contract debts which could not be paid out of the revenue for the current year, and then, without submitting the question to the qualified voters, would ask the General Assembly to authorize bond issues to pay debts already contracted, or for other expenditures desired to be made." (164 Va., at p. 7).

"Both the Constitution and the statutory law of this Commonwealth prohibit any and all boards of supervisors from incurring any debt for any purpose which is not payable out of current revenue, unless the question of the proposed expenditure is submitted to the qualified voters for their approval. The intent of the Constitution is unmistakable." (164 Va., at p. 8).

"An approval by a majority of the citizens voting on the question properly submitted to them is a prerequisite to the power of the board of supervisors to create an obligation for any purpose, payable at some future time beyond the termination of the current fiscal year. In no other way, directly

or indirectly, can the board bind the county on any such obligation." (164 Va., at p. 9).

Further light is given upon the purpose and intent of that section in an address by the Honorable William Meade Fletcher who was an advocate of its adoption in 1928. He interpreted it as purporting and intending to correct and prevent the growing tendency to impose financial burdens upon the counties or their districts without the approval of the taxpayers who must ultimately pay the same. He said:

"The proposed section 115-a is a new amendment, restricting the power of the counties and districts to borrow money. Under the present Constitution the members of the House and Senate representing a particular county, under a rule of courtesy prevailing in the General Assembly, may secure the passage of an act authorizing a bond issue for a county or district without a vote of either the Board of Supervisors or of the people of the county or district. At the recent session of the General Assembly, in several instances, it authorized certain counties to bond themselves without any action on the part of the Local Board of Supervisors or of the people. I have examined the Acts of the General Assembly of 1926, and find that in a great many instances the General Assembly authorized counties or school districts to issue bonds without any vote of the people. * * * The proposed amendment provides that before any county or district shall borrow money by the issuance of bonds, the question shall be voted upon by the people of the county or of the district and approved by a majority of the voters. I regard the proposed amendment as one of the greatest safeguards to the rights of the people against the incurrence of indebtedness by bond issues binding upon counties and districts without the consent of those who will have to be taxed to meet the interest and pay off the principal." See page 7 of the record in *Board of Supervisors* v. *Cox* (Rec. No. 1029).

Since the decision in the *Cox Case* on January 26, 1931, millions of dollars have been loaned from the literary fund to counties and county school districts. We are not

disposed to and do not impair the force and effect of that decision which we construe as limited solely to loans from that fund. But as the facts of that case are materially distinguishable from those here presented and the issue or point decided fundamentally different, the doctrine of *stare decisis* does not apply. *Chesapeake, etc., R. Co.* v. *Martin*, 154 Va. 1, 143 S. E. 629, 152 S. E. 335; *Morison* v. *Dominion National Bank*, 172 Va. 293, 1 S. E. (2d) 292; *Home Brewing Co.* v. *Richmond*, 181 Va. 793, 27 S. E. (2d) 188.

Since that adjudication, further consideration and interpretation have been given to sec. 115-a in *American-LaFrance, etc., Industries* v. *Arlington County, supra.* We there refused to further liberalize its provisions or to remove its plain restriction when applied to a transaction and obligation incurred by a county which did not involve loans from and of the literary fund as in the *Cox Case.*

It is asserted that these obligations will not constitute debts because they cannot be sold by the trustees of the Retirement System "except to a State Governmental agency." The simple answer to that contention is that an obligation in a fixed and certain amount bearing interest at a predetermined rate, principal and interest of which are made payable at stated intervals, is no less a debt because its holder or holders are classified and its negotiability is limited. It will be necessary to levy and collect the same tax as would be imposed if the securities were held by other parties. Though these monetary obligations be held by the Commonwealth or one of its agencies, the transaction will not assume an eleemosynary character, nor its substance become shadow when the taxpayers are called upon to pay the higher tax levy made necessary to raise the required funds to liquidate the long-term indebtedness imposed upon them.

The words of sec. 115-a as applied to the circumstances of this case are clear and definite; they leave nothing for interpretation.

"The province of construction lies wholly within the domain of ambiguity." *Hamilton* v. *Rathbone*, 175 U. S. 414, 421, 20 S. Ct. 155, 158, 44 L. Ed. 219.

"It is elementary that it is not permissible to interpret that which needs no interpretation." *Fairbanks, etc., Co.* v. *Cape Charles*, 144 Va. 56, 131 S. E. 437.

The words of Justice Holt, later Chief Justice, in *Title Ins. Co.* v. *Howell*, 158 Va. 713, at p. 718, 164 S. E. 387, are most fitting: "Ambiguities may be cleared away and weasel words explained, but that which is plain needs no explanation."

While the General Assembly has plenary power to raise and allocate adequate funds to the State Board of Education for teachers salaries, for the construction of schoolhouses, and other school purposes, yet the clear and plain language of section 115-a of the Constitution prohibits the General Assembly from imposition of any long-term debt upon any county without giving the taxpayers of that county an opportunity to express their approval of the proposed debt which they have to pay. The opinion in the *Cox Case* went no further than to say that this constitutional mandate did not apply to any sums which had actually been paid into the literary fund. When a sum had been allocated to the retirement fund, it is no longer a part of the literary fund but becomes earmarked for another and distinct purpose. That the literary fund was created and held for a special purpose and had been exclusively and completely dedicated to educational use was recognized by the legislature. Before any part of the principal could be set aside for teachers retirement fund, it was necessary to amend sec. 134 of the Constitution by adding the following provision:

"* * * provided that when and so long as the principal of the literary fund amounts to as much as ten million dollars, the General Assembly may set aside all or any part of the moneys thereafter received into the principal of said fund for public school purposes including teachers retirement fund to be held and administered in such manner as may be provided by general law."

That amendment was finally ratified November 7, 1944, and the legislature so empowered to use the principal so long as it was not reduced below ten million dollars.

Upon adoption of sec. 115-a, Virginia, by plain and direct promise, extended and gave to its taxpayers and citizens at large through and in that fundamental law its plighted faith that, praiseworthy though the ultimate object to be attained might be, it would not permit the imposition upon them, their counties or school districts of obligations and indebtedness of this character unless and until the opportunity to adopt or reject the same had been extended to the voters.

By equally simple and understandable language, it proclaimed in like solemn manner in sections 134 and 135 that its literary fund and interest thereon be set apart for school purposes. For 138 years through legislative enactment, and for more than 75 years under constitutional mandate, the principal of that fund has been so dedicated and its interest so used.*

It is our opinion that complete and strict fulfillment of that promise and undertaking should and must now be observed, and that the consummation of the proposed transaction would be a departure from that course and violative thereof.

We find nothing in the long history, purpose and use to which the literary fund has been applied, nor in the express or implied provisions of sections 134 and 135, to justify the belief that retirement funds may be made literary funds for a transitory period and purpose; that they can temporarily become literary funds in color and form but not in substance, to the end that they may be momentarily imbued with such literary fund qualities as to allow their investment or loan as such to the local school boards and, upon accomplishment of that undertaking, they shall thereupon return to their former status in full and absolute character. To the contrary, the strong and compelling implications, if not the express terms of those constitutional provisions, definitely negate any such conclusion.

In addition, the plain and expressed intent of sec. 115-a forbids the imposition of these long-term obligations upon

*Code of 1873, p. 695, note 7 to sec. 66 of Chap. 78.

the counties or school districts unless and until submission thereof to the vote of the qualified voters is had and their approval obtained.

Due weight has been given to the presumption of constitutional validity that attaches to acts of the General Assembly. *Blake* v. *Marshall*, 152 Va. 616, 148 S. E. 789.

And rightful consideration has been accorded the rule of construction that the Constitution and acts of the legislature be harmonized, if possible so to do, without doing violence to their purpose and intent. Yet we are constrained to conclude that when the actual literary fund has been exhausted by loans or use of such funds, it may not then be employed as a conduit or outlet, a mere banking house or brokerage institution, through which funds of the retirement system may be passed as if they were literary funds to the county school boards and the prohibition of sec. 115-a so circumvented and avoided. Nor can the reserve of the retirement system be loaned through and as literary funds to county school boards, and the interest, required by sec. 135 to be paid into the literary fund when its principal is invested, diverted and paid to a fund distinctly different in object and purpose.

We are not unmindful of the fact that the plan proposed is one of the means by which the State Board of Education desires to build a more efficient public school system. But the fact that sec. 129 of the Constitution imposes the duty upon the legislature to "establish and maintain an efficient system of public free schools throughout the State" does not justify the violation of other constitutional provisions. We are in hearty accord with the desire to attain these benefits. However, it is the duty of this court, when questions of this nature are submitted to it, to see that the means to accomplish the end desired are within the framework of the Constitution, the fundamental law of the land.

For the reasons stated, we conclude that the amendments to sec. 18 of the Retirement Act by Acts of 1946, p. 522, and the amendment to sec. 643 of the Code by Acts of 1947, p. 68, in so far as they attempt to allow the purchase of

securities of the literary fund with reserve assets of the retirement fund for the purpose of permitting the State Board of Education to transmit and loan money so obtained in that manner from the State Treasury belonging to the retirement fund to county school boards as literary funds, contravene sections 115-a and 135 of the Constitution of Virginia and are unconstitutional and inoperative for that purpose.

The prayer for mandamus is denied.

*Mandamus denied.*

HUDGINS, C. J., concurring.

There are two trust funds involved in this litigation. These two trust funds are collected, invested, managed, and the income therefrom disbursed for two separate and distinct purposes by two separate and distinct boards—the Board of Trustees of the Virginia Retirement System and the State Board of Education. The former is hereinafter referred to as the Board of Trustees, the latter as the State Board.

The fund in the custody and under the management and control of the Board of Trustees as of June 30, 1948, totaled $21,411,970, including $6,452,850 paid by the public school teachers and $3,258,025 paid by other State employees. The General Assembly has appropriated to this fund $7,631,215 for the benefit of public school teachers and $3,475,061 for the benefit of other State employees. Under the management of the Board of Trustees this fund had earned approximately $572,000. The general purpose for which these sums are held and invested is to guarantee social security to teachers and other State employees through periods of sickness, injury, disability, and old age. Specific precautionary measures were adopted by the legislature to preserve this fund intact for the benefit of the beneficiaries named therein (Acts of 1942, Chapter 325, section 18, sub-sections a-f, inclusive).

The amount of this fund has grown from year to year as the advantages of the retirement system have been accepted by a larger number of teachers and other State employees.

For the 1944-46 biennium there was appropriated from the State general fund $3,573,347.38. For the 1948-50 biennium there was appropriated from this same fund $7,658,550. These figures demonstrate that it is equally as important to the public school teachers and the other employees of the State as it is to all taxpayers for these trustees to exercise the highest degree of care consistent with good business judgment to protect this fund from all depreciation and loss.

Stripped of all circumlocution, the dominant question presented is whether the Board of Trustees may use trust funds under its control to purchase long-term "bonds, notes, and other evidences of debt" of the school boards of the counties, issued without submitting the question of incurring the indebtedness to the electors of the respective counties for approval.

The answer to the question depends upon whether the school boards have the authority without the approval of the electors of the respective counties to incur such indebtedness. If a county school board has such authority, then the Board of Trustees may purchase the bonds direct from the local school board, from a licensed broker, from the State Board, or from any other party who has the legal right to sell them. If a school board has no authority to incur such indebtedness without the approval of the electors, then neither the Board of Trustees nor any other party can buy or sell an enforceable interest in such obligations.

The power of the legislature to authorize the State or any of its political subdivisions to incur a long-term debt is unlimited except where it is limited or restricted by the Virginia Constitution, the fundamental law of the land. Section 115-a of the Constitution in express terms prohibits any county or the school board of any county from contracting any long-term indebtedness unless the power so to do is conferred "by the General Assembly by general law." The constitutional prohibition doesn't stop there; the provision goes further and prohibits the General Assembly from enacting any general statutes authorizing any county or any school board of any county to contract a long-term debt unless

there is contained in such statute a provision submitting to the qualified voters of the county or district the question of contracting such debt. "And such approval shall be a prerequisite to contracting such debt. No script, certificate or any other evidence of county or district indebtedness shall be issued except for such debts as are expressly authorized in this Constitution or by the laws made in pursuance thereof."

The prohibition of this constitutional provision limiting the power of the legislature is expressed in simple, clear, and unambigious language, and there seems to be no ground for misunderstanding the plain meaning of this inhibition.

We now turn to the pertinent statutes to ascertain the kind of debt that the legislature has authorized the school boards of the respective counties to contract, without submitting the question to the qualified voters, and the means adopted for the enforcement of the collection of such indebtedness. The indebtedness which the school board of any county is authorized to contract must be evidenced by a bond or note signed by the chairman of the county school board, attested by the clerk, payable in annual installments from 5 to 30 years to the Commonwealth of Virginia for the benefit of the literary fund, and bearing interest at 2% payable annually (Section 643).

The common and accepted definition of a bond is a writing under seal by which a person binds himself to pay a certain sum on or before a future date (Webster's New International Dictionary, Second Edition). A bond "is a deed by which the obligor promises to pay a certain sum of money to another at the date appointed." (*Preston* v. *Hull*, 23 Gratt. (64 Va.) 600, 14 Am. Rep. 153.) The common and accepted definition of a note is a written acknowledgement of a debt and a promise to pay. A debt is that which is due from one person to another; it is an obligation which one person is bound to pay to another; "that of which payment is liable to be exacted; due, obligation, liability." (Webster's New International Dictionary, Second Edition.) The following statutes provide most stringent measures for the enforcement of the payment of the bonds or notes

executed by the county school boards.   These may be enumerated as follows:

(1) Section 644 requires the board of supervisors of any county "in which the school board thereof has borrowed money from the Literary Fund" to "include in its levies, or appropriate a sum sufficient, as the case may be, to meet its liabilities on such contract."   If such school board fails to pay any installment promptly, then, upon written notice the county treasurer must pay all past due installments of interest or principal out of any funds in his hand belonging to the county.

(2) If the board of supervisors fails to make adequate provision for the prompt payment of the debt, then such failure must be deemed non-feasance in office; and if the Commonwealth's attorney of such county fails to institute ouster proceedings for such non-feasance, then the Attorney-General is to forthwith institute such proceedings against all members of the board of supervisors guilty of such non-feasance in office.   (Section 644).

(3) The holder of such bonds or notes shall have a specific lien, for the payment of all principal and interest, on all lots, buildings, and additions thereto erected with the proceeds obtained from the bonds; and all such buildings shall be kept fully and adequately insured for the benefit of the holder and the policies of the insurance shall be kept in the office of the State Treasurer.   (Section 645).

(4) The holder of such bonds or notes is given a specific lien "against all of the funds and income of said county . . . as well as upon the property upon which that loan is made."   (Section 633).

(5) The holder of such bonds or notes is given the same rights that other creditors have to institute appropriate proceedings in the name of the Commonwealth, in the proper court, to recover any past due installments of principal or interest.   (Section 635).

It thus appears that when a county school board contracts a debt under the provisions of the statutes cited, it becomes a debt of the county, a specific lien not only upon

the lot which must be purchased with county funds, but also upon the buildings erected thereon from the proceeds of the loan, and a lien upon all the funds and income of the county. It is not only a debt in every sense of the word, but it is a secured debt.

Under this plan devised by the legislature the taxpayers of the county have no voice, no representative of their own selection, to pass upon the advisability of incurring the indebtedness which creates a lien upon their property. The board of supervisors, whom the taxpayers of the county elect to legislate for them and pass upon the validity of all claims for and against the county, has no voice in determining whether or not such a debt shall be incurred. On the other hand, their failure to provide for the payment of such a debt out of the taxpayers' money warrants their removal from office. Responsibility for the financial integrity of the county, so far as the schools are concerned, is entirely removed from the taxpayers themselves, as Code, section 642, provides: "No loan shall be made in any case in which the payment of the same with interest would in the judgment of the State Board of Education entail a too heavy charge upon the revenues of the county or city to which such loan is granted."

It is conceded that the question of contracting the debts involved in this litigation was never submitted to the qualified voters of the respective counties for their approval or rejection. The provisions of the Constitution (section 115-a) expressly prohibit the General Assembly from authorizing the county school boards to incur any such indebtedness.

It is contended that it is not the proper exercise of judicial power to impose "such an arbitrary limitation" upon the authority of the General Assembly as to hold that the Board of Trustees may not purchase such bonds or notes. The Court is not imposing any such limitation. It is simply holding that a debt authorized by the legislature, which the Constitution in simple, plain, everyday language prohibits it from authorizing, is invalid. When the Constitution

declares that the legislature shall not authorize the school board of any county to contract a long-term debt without submitting the question to the qualified voters for their approval, and the legislature proceeds to do just that, a court has no alternative in the matter but to point to the plain language of the constitutional provision and to declare that the act is invalid because the people have forbidden the legislature to exercise such power. The constitutional provision, in order to be understood, needs only to be read. It needs no elaboration, construction, or interpretation by the court. *American-LaFrance, etc., Industries* v. *Arlington County*, 164 Va. 1, 178 S. E. 783, 99 A. L. R. 929.

The other fund involved is a trust fund set apart by section 134 of the Constitution as a "permanent and perpetual" trust fund. This fund includes the literary fund on hand when the Constitution was adopted, augmented from time to time by the proceeds of all public lands donated by Congress for public school purposes, all escheated lands, all waste and unappropriated lands, all property accruing to the State by forfeiture, all fines collected for offenses committed against the State, and such other sums as the General Assembly may appropriate. It is further provided (Constitution, section 135; Code, sections 632-33) that this fund, known as "The Literary Fund," shall be invested and managed by the State Board of Education, the principal of which shall always remain unimpaired and entire and the annual income arising therefrom shall be dedicated exclusively to the support and maintenance of the public schools in the State. This purpose is wholly separate and distinct from the purpose for which the Board of Trustees of the Virginia Retirement System holds and invests the trust fund entrusted to its care, custody and management.

It is contended that this court in *Board of Supervisors* v. *Cox*, 155 Va. 687, 156 S. E. 755, held that a loan made to a county school board out of the literary fund by the Board of Education did not come within the inhibition set forth in section 115-a of the Constitution.

The majority of the court did so declare and said:

"We are of opinion that the amendment, section 115-a, has no application whatever to Literary Fund loans to local school boards."

The primary reason advanced for so holding was set forth in the following language (page 701): "The major portion of this fund arises from forfeitures and fines collected through the various courts in the counties and cities of the State. The counties and cities are acting, in the collection of this portion of the fund, as agencies of the State and the theory of the system is that the money so derived should go back to those counties and cities in the form of loans, equally distributed among them, for educational purposes. The school boards of the counties and cities in procuring loans from the literary fund for building schoolhouses are likewise acting as agencies of the State in assisting in carrying out the mandatory duty imposed by the Constitution that an efficient free school system shall be maintained."

It is contended that the legislature may authorize the Board of Trustees to transfer a part of the State retirement fund to the State Board and, when this transfer is made, by some metamorphosis, this part of the retirement fund becomes a part of the literary fund, and hence, within the influence of the decision in the *Cox Case*.

The legislature has power to augment the "permanent and perpetual literary fund" by appropriation of funds under its exclusive control, but it has no power to augment the literary fund by any appropriation of funds entrusted to its care by the public school teachers and other State employees for a specific, definite purpose; nor can it, without breach of covenant with these public school teachers and other State employees, transfer to the literary fund, money it has allocated to the retirement fund.

The statute, in mandatory terms, requires the Board of Trustees to collect the interest or income from all the funds entrusted to its care for the benefit of the public school teachers and other State employees. The Constitution (section 135) requires, in mandatory terms, that the legislature

and the State Board, by whom it acts, apply all the annual interest collected from the literary fund "to the schools of the primary and grammar grades for the equal benefit of all the people of the State." The income from all the assets of each of these separate trust funds cannot be intermingled. All of such income must go wholly for one purpose or the other.

It is conceded that the decision in the *Cox Case* went no further than to hold that, inasmuch as the literary fund was a fund dedicated to public school purposes, the State Board could make a part of that fund available for a loan to the county school boards for public school purposes, and that section 115-a of the Constitution did not apply to such a transaction.

In that case, however, the literary fund was regarded as a "permanent and perpetual" fund which would be augmented from time to time, principally in comparatively small amounts realized from the collection of fines throughout the State. There was no suggestion either in the argument, in the briefs, or in the conference of the members of the Court in the *Cox Case*, as to the power of the legislature to authorize the State Board to make a permanent sale of such county school bonds held as a part of the assets of the literary fund and reinvest the proceeds of such sale in county obligations issued without the approval of the electors. Such transactions would give to the State Board not only the control of unlimited sums which are not a part and were never intended to be a part of the "permanent and perpetual literary fund" but would give to the State Board the power to determine what sums should be raised by local taxation to supplement the funds provided by the State for the support of local schools of the respective counties. The legislature cannot delegate a power which the Constitution forbids it to exercise.

This question was determined adversely to the contention of the Attorney General in *School Board* v. *Shockley*, 160 Va. 405, 168 S. E. 419. There the constitutionality of Chapter 173 of the Acts of 1930 was challenged. This act

directed the board of supervisors of Carroll county, in addition to all other levies, to impose annually for a three-year period, a tax of 50 cents on each $100 of assessed value of both real and personal property within the county, to be used for the purpose of erecting a high school in the town of Hillsville, the county seat. Judge Chinn, speaking for the Court, referred to the fact that section 129 of the Constitution imposed a mandatory duty on the General Assembly to establish and maintain an efficient system of free schools and that sections 130-136 create State and local agencies charged with the management, control, and operation of the free school system. After quoting the pertinent parts of section 136 of the Constitution, he said:

"Considering these clear and unqualified provisions, as placed in the Constitution, and in connection with the related provisions thereof, it is obvious that it was the purpose of this section to vest in the local authorities of each county and school district of the State the exclusive power to determine what additional sums, if any, should be raised by local taxation to supplement the funds provided by the State for the support of the schools in the respective counties and school districts; and the exclusive power to levy the tax for school purposes on the property specified, if any is imposed, subject only to the limitation that if any tax at all is levied it shall not 'exceed in the aggregate in any one year a rate of levy to be fixed by law.'

"The local authorities of each county and school district being thus vested with the exclusive power to impose local taxes for school purposes under this section, the necessary implication is that the General Assembly is prohibited by the Constitution from exercising that power."

The result of the contention of petitioner would be to authorize the State Board to lend $1,000,000 to the county school board of one county, then sell the evidence of that debt to the Board of Trustees for $1,000,000, and use that $1,000,000 to lend to another county school board. This process could be repeated at least one hundred times, once or more for each county in the State. If the legislature can

authorize the Board of Trustees to use the retirement fund to purchase such obligations from the State Board, then it can authorize the Highway Commission, or any insurance company, or investment banker to purchase such obligations.

The argument advanced in support of the constitutionality of the statutes is based on the assumption that the Board of Trustees has no right to use retirement funds to buy county school bonds not approved by the taxpayers from the county school board but has the right to. buy the same bonds if they have become a part of the literary fund. When such bonds are under the control of the State Board, we held in the *Cox Case* that they are a part of the literary fund. But when such bonds are sold by the State Board to the Board of Trustees or to other parties, they cease to be a part of the literary fund and become a fund held for an entirely different purpose. The Board of Trustees should not be permitted to do indirectly what it is illegal for it to do directly. The theory advanced makes the State Board a mere broker clothed with exclusive power to buy and sell county school bonds issued without the approval of the taxpayers of the respective counties. For the Court to put its stamp of approval upon such transactions would render the provisions of sections 115-a and 136 of the Constitution complete nullities.

It seems to me that the only reasonable conclusion which can be reached is that when the electors of the State adopted the Constitution, they deprived the legislature of the power to disburse the income derived from the permanent and perpetual literary fund except for the benefit of the schools. It cannot authorize the income from the retirement fund to be used except for the benefit of the public school teachers and other State employees without breaking its covenant with them. Nor can. the legislature, except as hereinafter stated, transfer any part of the literary fund to the retirement fund without violating the inhibition prescribed by the Constitution.

Prior to 1942, the public generally and the school teachers in particular thought that the legislature had not made ade-

quate provision to compensate the school teachers through periods of sickness, injury, disability, and old age. In 1942, the legislature took steps to remedy this situation. The literary fund had increased from $10,000,000 to approximately $15,000,000, and it was thought that the income from this latter sum plus other funds authorized by section 135 of the Constitution was too much to be devoted to the schools of the primary and grammar grades. Hence, a resolution was introduced and passed by the General Assembly at its regular 1942 session, amending section 134 of the Constitution to the effect that the General Assembly might set apart so much of the principal of the literary fund as should exceed $10,000,000 "for public school purposes, including the Teachers' Retirement Fund, to be held and administered in such manner as may be provided by general law." This amendment to the Constitution was adopted by the electors on November 7, 1944. Under the provision of this constitutional amendment, the General Assembly in 1946 (Item 72 of the Budget Bill, Acts 1946, page 799), and in 1948 (Item 76 of the Budget Bill, Acts 1948, page 1151), allocated to the Virginia Retirement System from the literary fund $2,000,000 for the retirement of public school teachers of the State. At the former session it was estimated that during the biennium 1946-48, the school teachers themselves would pay into the retirement fund the sum of $3,005,000, and for the biennium 1948-50, $3,557,840.

Before the legislature had the power to make this transfer of the $2,000,000 from the literary fund, it was necessary to submit the question to the electors of the State in the form of a constitutional amendment. This part of the literary fund, having been definitely transferred to the retirement fund, ceased to be a part of the literary fund, and must therefore be administered by the Board of Trustees for the benefit of the public school teachers.

It will be noted that the provisions of section 115-a of the Constitution apply only to counties, districts of the counties, and to school boards of the school districts and school boards of the counties. None of the provisions ap-

plies to municipalities. The only constitutional limitation placed upon municipalities regarding the issue of bonds or other interest-bearing obligations, except for certain non-pertinent exceptions, is that the total amount of such indebtedness shall not exceed 18% of the assessed valuation "of the real estate in the city or town subject to taxation as shown by the last preceding assessment for taxes." There being no constitutional inhibition, the legislature has power to authorize the municipal subdivisions of the State to borrow money, within the limits stated, from the State Board of Education or from other parties without submitting the question to the electors of the respective municipalities for their approval.

It is contended that such conclusions will give the municipalities an advantage over the counties in the erection of school houses. There is a difference between the method by which a county may incur a long-term debt and the method by which a municipality may incur such a debt, but it is a difference which the electors have themselves placed in the Constitution, the fundamental law of the State. This difference must be recognized and observed not only by the courts but by the members of the legislature and all State and county officials. The court cannot be influenced in its decisions by whether the constitutional provision is wise or expedient, when the meaning of the language contained therein is clear and explicit.

It is quite true that the Constitution (section 129) imposes upon the General Assembly a mandatory duty to establish and maintain an efficient system of public free schools throughout the State. It provides that this mandatory duty shall be performed under the supervision of a State Board of Education (section 130) and a Superintendent of Public Instruction (section 131). The same Constitution, in mandatory terms, prohibits the legislature from authorizing a county school board to incur a long-term debt without the approval of the electors of the county. The same Constitution (section 127) prohibits any municipality from incurring an indebtedness which exceeds 18% of the as-

sessed valuation of the real estate within such municipality. There is nothing inconsistent in these mandatory provisions. The provisions are not conflicting. Indeed, when the plenary power of the legislature to provide the means to maintain and establish an efficient public school system is considered, the inhibitions contained in these provisions are minor. Whether they are major or minor, however, the inhibitions are nevertheless in the Constitution and must be given effect. The legislature in adopting means to establish and maintain an efficient school system must do so within the framework of the Constitution.

It is stated in the dissenting opinion that the provisions of section 129 of the Constitution are in conflict with the provisions of section 115-a. While I do not agree that the two sections are in conflict, even if such were the case, the provisions of section 115-a must be given effect as that section was adopted by a vote of the people in 1928, 26 years after the provisions of section 129 became effective by proclamation and not by popular vote.

"As the latest expression of the will of the people a clause in a constitutional amendment will prevail over a provision of the constitution or earlier amendment inconsistent therewith, for an amendment to the constitution becomes a part of the fundamental law, and its operation and effect cannot be limited or controlled by previous constitutions or laws that may be in conflict with it." 16 C. J. S., Constitutional Law, p. 67. See 11 Am. Jur., Constitutional Law, sec. 54, p. 664.

The substance of the argument in the dissenting opinion is that the provisions of section 115-a are unwise and inexpedient. The proper place in which to present such an argument is on the hustings before the electors and not in a judicial forum where the language of the Constitution must be construed as it is written.

For the reasons stated, it is my opinion that those parts of the statutes involved which purport to authorize the Board of Trustees to purchase from the State Board obligations of the county school boards, incurred without the

approval of the electors of the respective counties, are invalid; and that those parts of the statutes involved which authorize the Board of Trustees to purchase such obligations of the school boards of the municipalities from the State Board are valid.

The foregoing are additional reasons for my approval of the views expressed in the majority opinion.

EGGLESTON, SPRATLEY, BUCHANAN and MILLER, JJ., concur in this opinion.

STAPLES, J., dissenting.

I cannot concur in the opinion of the majority of the court. The cardinal principle of constitutional law laid down in *Board of Supervisors* v. *Cox*, 155 Va. 687, 156 S. E. 755, is that loans made to counties out of State funds for the erection of school buildings do not constitute a "debt" of the county within the meaning of section 115-a of the Constitution. That section is an amendment of the Constitution ratified in 1928. It prohibits the General Assembly from enacting any law authorizing the school board or any other agency of any county to contract a long-term debt unless same is approved by a majority of the qualified voters at a referendum election.

For over twenty years prior to the ratification of said amendment legislation had been in force authorizing loans of the type here involved without requiring popular approval. After its ratification it was generally considered by the school authorities as not applicable to these loans, and the practice of so making the loans without such approval was continued for about two years without challenge. However, on June 10, 1930, a group of freeholders of King and Queen County attacked the validity of the statute and this action culminated in the decision of this court in *Board of Supervisors* v. *Cox, supra.*

This decision turned upon the question whether section 115-a was in conflict with section 129 of the Constitution,

and, if so, the effect of such conflict. Section 129 provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State."

In resolving this question, the first consideration was whether it was necessary for the General Assembly to be empowered to provide for loans out of State funds to build county schoolhouses without popular approval in order to "establish and maintain an efficient system of public free schools." We held that the possession of this power *was* necessary to enable the discharge of that duty.

The next question was, in view of this necessity, whether the prohibition of section 115-a against contracting a debt without popular approval should be construed as impairing this necessary power which the General Assembly had been accustomed to exercise in discharging this duty. We held that section 115-a was not intended to impair this power; that it was applicable only to "voluntary" bond issues initiated and sold by the counties entirely independent of State funds or State action or approval. The following language from the able opinion of Mr. Justice Gregory in the *Cox Case* is illuminating:

"*It is only to the debts or loans of the voluntary class that section 115-a of the Constitution is directed.* To hold otherwise, would in effect be to construe section 129 of the Constitution as imposing on the General Assembly the duty to provide schools, and section 115-a as denying it the power to perform that duty." If the section applies only to loans of the so-called "voluntary" or commercial type, it follows that it cannot apply to loans made by the State of the type here involved. The opinion continues:

"The State Board of Education and the local school boards are the agencies through which it" (the General Assembly) "can and does provide these schoolhouses. If section 115-a is to be construed as requiring the approval of the voters before such buildings can be constructed with these funds, the practical effect will be to deny to the General Assembly, *the principal, if not the only, means it has* of carrying out or performing the mandatory duty imposed on it. *Current*

*revenues of the State have never been used for such purpose."* (Emphasis supplied).

"It was not the purpose or intention of the General Assembly in submitting section 115-a of the Constitution to the people, nor was it the intention of the people in ratifying the amendment, to hamper and disrupt the educational activities of the State by requiring a vote of the people on loans from the literary fund. * * * suppose the election should be unfavorable to the loan, and there be no general funds available, is the county to be left without a schoolhouse?"

The situation now existing, since the lending capacity of the literary fund has been exhausted, is precisely that pictured by the foregoing emphatic language. The opinion further points out that the loan is but an intra-governmental or joint State-county transaction, saying:

"Under article 1, section 14, of the Constitution, no government, separate and independent of the State government, is permitted. County government has been provided for and it is made one of the instruments or agencies through which the State performs its function of government. It is an arm of the State. A county school board borrowing from the State Board of Education the State's money (literary fund), which has been set apart and devoted to schools, *is but a transaction between two agencies of the State concerning the application and use of the State's funds."* (Emphasis supplied).

Clearer language could not have been used to express the court's conclusion that the prohibition against legislative action by the General Assembly contained in section 115-a was directed exclusively to commercial debts or bond issues to be contracted by the counties with approval of the voters. This basic principle is enunciated in the opinion without reference to any particular fund of the State out of which the financing of school buildings should be made. Nor is there any provision of the Constitution which would have justified the court in limiting the exercise of this broad legislative power to intra-governmental loans from the literary fund or from any other particular fund.

The majority opinion here, however, holds that because only loans from the literary fund were considered or involved in the *Cox Case*, the principles there established must be restricted to such loans. It says that "Upon adoption of sec. 115-a, Virginia, by plain and direct promise, extended and gave to its taxpayers and citizens at large through and in that fundamental law its plighted faith that, praiseworthy though the ultimate object to be attained might be, it would not permit the imposition upon them, their counties or school districts obligations and indebtedness of this character unless and until the opportunity to adopt or reject the same has been extended to the voters."

I cannot understand how the quoted statement can be held consistent with the validity of loans from the *literary fund itself*, concerning which the voters are not given an "opportunity to adopt or reject the same." It is not any less painful to the taxpayer to discharge the obligation of a loan from the literary fund than one from the retirement fund.

Of course, if the Constitution prohibits such loans from the retirement funds, I agree that such prohibition cannot be circumvented by indirectly lending it through the *modus operandi* of literary fund loans. The main point in the case, as I see it, is whether any foundation exists in the Constitution for discriminating against the power of the General Assembly over any funds which may be under its absolute control for investment purposes. I can see no reason why the direct authority could not be conferred by statute upon the State Board of Education to invest the retirement fund in school loans in like manner as it invests the literary fund. It is merely a question of legislative choice of an investing agency. It was more convenient, however, and served the same purpose to provide for the sale to the retirement fund of loans made from the literary fund.

For nearly half a century it has been the policy of the legislature in the enactment of general laws to require the voters' approval of bond issues in cases where the consent or approval of the State Board of Education was not required or where they were intended for public sale. It has been

likewise the policy to dispense with such approval in loans made by the State to the counties to aid in the building of schools. This is evidenced by two acts which were passed on the same day, March 15, 1906. Chapter 252 of the Acts of that year authorized loans from the literary fund for school buildings under a plan substantially the same as that now in effect. On the other hand, Chapter 255 required the approval of the qualified voters before school bonds for sale to the public could be issued by the county school boards. The Code revisors incorporated both of these Acts (as subsequently amended) in Chapter 34 of the Code of 1919, and, standing side by side, they constituted the entire chapter. The Literary Loan Act was embraced in Code sections 757 to 764, and the act requiring popular approval of school bond issues in sections 765 to 773. Under one plan the approval of the voters was required, under the other the approval of the State through its agency, the State Board of Education, was necessary. Approval of the voters was also required for bond issues for other public buildings and improvements, Code 1919, sections 2738, *et seq.*, sections 2110, *et seq.*

## PURPOSE OF THE 115-A AMENDMENT

The reason for amending the Constitution as in section 115-a clearly appears from the statement of Judge Fletcher quoted in the majority opinion, and also in the observations of Mr. Chief Justice Hudgins in his concurring opinion in this case. It was because of a practice which had grown up in the General Assembly of giving the general law the run around by enacting local bills authorizing specific bond issues for some particular purpose but without approval of the electorate. When the Senator and Delegate representing a county desired the passage of such a local bill it was enacted as a matter of course.[1] The real purpose of the

---

[1] At the 1928 session, just three months prior to the ratification of section 115-a, no less than fourteen such bills were passed as emergency measures so as to get under the wire before the adoption of the amendment. Only one of them was for a school building, however. Most of them were for roads.

section 115-a amendment was to abolish this practice as evidenced by the first sentence of the section. It prohibits the contracting of county debts "except in pursuance of authority conferred by the General Assembly by *general law*." A *general* law is one which applies alike to all counties similarly situated. The general bond issue law requiring approval of the voters applies to all counties. Section 115-a had the effect of abolishing this practice of passing local legislation authorizing bond issues without the approval of the qualified voters. And obviously that was the cardinal purpose of the amendment. It clearly was not intended to affect intra-governmental transactions such as State loans in aid of schools, *in which the approval of the State was required*, or to impair the power of the General Assembly over this entirely different type of loan which had then been imbedded in State policy for over twenty years. In these loans *approval by the State* had been considered enough to dispense with the necessity for approval by the qualified voters. In 1906 and subsequent years the power of the General Assembly to provide for and approve such loans was not restricted to the literary fund or any other State fund. I do not think it is so restricted now.

Section 115-a also requires that in any "*general law*" which authorizes the contracting of any such county debt "provision shall be made for the submission to the qualified voters" of the question of their approval or rejection thereof.[2] This provision was necessary to effectuate the above purpose of prohibiting legislation which might authorize one county or a few counties to contract such debts without such a referendum. There are a great many *general laws* which affect only one or two counties.[3] Such a general law affecting only one county is customarily passed

[2] No change in the general law relating to county bond issues was required by the amendment. Since 1906 the statute had required approval by the voters.

[3] Counties may be classified by their density of population, such as Arlington County, or by the fact that they are adjacent to cities of a certain size (as Henrico and Chesterfield counties), and by many other circumstances and conditions.

upon the recommendations of that county's Senator and Delegate, and, in this respect, is considered by the General Assembly substantially the same as a local or special act.

It is true that the opinion in the *Cox Case* emphasizes the propriety of the use of the literary fund as loans for aid in the building of county schools. But this was merely in support of the wisdom of the legislation, and not an inference that section 115-a was intended to impair the power of the General Assembly to provide this type of loan for school buildings from other sources. It was not held in that case that only literary fund money could be utilized by the General Assembly for loans to counties. The opinion expressly pointed out that this fund was the *"principal"* means available for that purpose *"if* not the only." But it did not hold it *was* the only means. The clear implication was that there *might* be *other* available funds. No investigation of the availability of other moneys was made in that case. The literary fund was then adequate and no question of using other funds was presented or could have been decided. We did hold that it was the mandatory duty of the General Assembly to provide the counties, cities, and towns, with adequate funds for school buildings so as to "maintain an efficient system of free schools." If in the future the literary fund should prove insufficient, the obvious and necessary inference is that other available funds should be utilized. This has been both the administrative and legislative interpretation of that opinion, and it was on that interpretation that the legislation now declared invalid was based. We said in the *Cox Case:*

"The General Assembly in enacting the school code and thereby arranging for local school boards, without the approval of the voters, to borrow from the literary fund, which the Constitution devoted to the commendable purpose of free schools, *was but performing its mandatory duty and carrying out a wise and sound public policy.*" (Emphasis supplied).

I think experience has proven the correctness of the view taken in the *Cox Case* in 1931. The funds made available

by the General Assembly to provide school buildings have proven of inestimable value to the counties. They have been saved the trouble, cost and expense incident to the issuance and marketing of ordinary bonds, as well as the strife and bickering which a bond issue election frequently stirs up among the people.

Another important advantage enjoyed by literary fund loans over the ordinary bond issue is in the liberal policy and lenient treatment accorded by the State. The counties are given the privilege of paying off the principal at any time, and frequently, whenever the prevailing interest rate has dropped, the State has reduced its rate, not only on new literary fund loans, *but also on all those previously made at a higher rate*. In order to accomplish these purposes, it is essential that the ownership of the loans remain in some State agency in accordance with the holding in the *Cox Case*.

## ADMINISTRATIVE AND LEGISLATIVE INTERPRETATIONS OF THE *COX CASE*.

Ever since the depression year of 1938 the practice has been for the Department of Education, if necessary, to sell literary fund county bonds to the State Sinking Fund Commissioners, thus calling in the invested literary fund moneys and reinvesting same in other like loans. At that time the original literary funds available for that purpose became exhausted and it was deemed highly desirable by the State Board of Education and others in authority to expand the State's lending powers in order to take advantage of Federal grants for public school buildings. Through these sales the moneys in the sinking fund were utilized by the State Board of Education as schoolhouse loans to counties. Many Federal grants were matched and obtained in this manner. A great number of school buildings were erected at a time when building costs were low. In addition, employment was thus provided for many persons who were in dire need. These transactions were approved in an official

opinion of the Attorney General. (See opinions of the Attorney General, July 1, 1938, to June 30, 1939, p. 160). This plan for utilizing these other funds of the State was widely known, but no question of its constitutionality was ever even hinted at. The only restriction which was thought proper was that the bonds could not be sold or resold except to another State agency or arm of the State Government in conformity with the principles enunciated in the *Cox Case*.

With knowledge of this well-known and unquestioned practice, the Teachers Retirement Fund was established at the 1942 session of the General Assembly (Acts 1942, Chapter 325). It was at that time deemed advisable to relieve the current general funds of the State of a part of the burden of making contributions to said retirement fund by transferring thereto a part of the principal of the literary fund. Accordingly, such an amendment to the literary fund section of the Constitution (section 134) was submitted to the electorate and ratified in 1944. It authorizes the General Assembly to transfer all or any part of the moneys in the literary fund in excess of ten million dollars to the teachers retirement fund.

At its 1946 session, by Item 72 of the Appropriation Act (p. 799), the General Assembly appropriated or transferred *from the literary fund to the teachers retirement fund* one million dollars for the ensuing biennium. At the same session section 18 of the Virginia Retirement Act was amended authorizing the Retirement Board to invest its "trust funds in bonds, notes and other evidences of debt of the school boards of the several counties, cities and towns of the State held in the Literary Fund evidencing loans made from such Literary Fund by the State Board of Education." The amendment of said act also provides that "the State Board of Education is hereby authorized to assign such bonds, notes and other evidences of debt to the (Retirement) Board whenever the Board desires to invest any of such trust funds therein and the State Board of Education consents thereto; and when such bonds, notes or other evidences of debt are

so acquired by the Board *the same may not be sold or otherwise disposed of except to a State governmental agency.*" (Acts 1946, at pages 522-523). The italicized language was embodied in the act obviously in recognition of the principle laid down in the *Cox Case* that the transactions should remain intra-governmental. By Chapter 27 of the Acts of the Extra Session of 1947, section 643 of the Code was amended so as to permit the State Board of Education to charge a higher rate of interest on literary fund loans which were intended for sale to the Retirement Board, as an inducement to the Board to purchase them. The act of the General Assembly left it entirely in the discretion of the Retirement Board whether to purchase any of the bonds, or the extent of any such purchases.

The several foregoing legislative actions were designed to carry out a fully and carefully considered plan to transfer a part of the principal of the literary fund to the teachers retirement fund and at the same time to continue the use of the moneys so transferred in making loans for school buildings. The plan also contemplated the possible use of additional moneys for such loans when necessary. Pursuant to this legislation and the 1944 amendment of section 134 of the Constitution, *the General Assembly has transferred two million dollars from the literary fund to the teachers retirement fund.* Under the court's decision in this case, this money can no longer be used to finance school buildings.

The majority decision here invalidates and strikes down this plan of the General Assembly. Denial of its power to provide this additional money for loans to finance school buildings destroys its ability to properly perform the duty imposed on it by section 129 of the Constitution to "establish and maintain an efficient school system." This becomes apparent when we consider that the cost of such buildings has more than doubled within the last three or four years, and that there is no longer enough money in the literary fund to finance their construction.

While the majority opinion holds that the Constitution

prohibits the General Assembly from lending the counties, under the plan approved in the *Cox Case, any money other than the actual principal of the literary fund,* no provision of the Constitution is referred to or pointed out as imposing any such arbitrary limitation on the lawmaking body. In fact, there is not a word in the Constitution remotely touching on the subject of literary fund loans to counties. Such loans are wholly statutory in origin. I can perceive no principle or reason to justify the court's conclusion that the power of the legislature to establish and maintain schools is so limited that it cannot likewise use other funds at its command for the same worthy purpose. It is an elementary rule that the General Assembly possesses all legislative powers not forbidden expressly or by necessary implication by the Constitution of the State. There is certainly no *express* limitation of the amount of funds the legislature may employ for this purpose. *That its power to finance school buildings through these loans in the performance of its mandatory duty actually exists, we held in the Cox Case,* and I can find nothing in the Constitution which by any stretch of the imagination can be construed as an *implied* restriction upon the *amount of loans* which the General Assembly may make available when it deems it necessary. The limitation here imposed upon the exercise of legislative discretion in this matter seems to me an arbitrary one, and I think it is without any foundation or basis in reason or principle. If the court can properly restrict the exercise of this legislative power to the moneys in the literary fund, it can just as logically restrict it to fifty per cent of that amount.

The majority opinion implies that the legislature's power to lend the literary funds for school buildings stems from the fact that "section 134 of the Constitution *dedicated the literary fund to school purposes.*" This section, as it read prior to the 1944 amendment, was as follows:

"The general assembly shall set apart as a permanent and perpetual literary fund, the present literary fund of the State; the proceeds of all public lands donated by Congress for public free school purposes; of all escheated property;

of all waste and unappropriated lands; of all property accruing to the State by forfeiture, and all fines collected for offenses committed against the State, and such other sums as the general assembly may appropriate."

The only mention in the section of "school purposes" is in designating the type of public lands, the proceeds from which shall constitute part of the fund. There is no provision whatever as to how the General Assembly shall provide for the investment of the fund, and no intimation that it shall be lent for the construction of public schools.[4] The only other provision in the Constitution relating to the literary fund is found in section 135 that "The General Assembly shall apply the *annual interest* on the literary fund * * * to the schools of the primary and grammar grades for equal benefit of all the people of the State * * * ."[5] This provision has no relation to the investment of the fund and neither enlarges nor restricts the legislative power in that respect.

## RETIREMENT FUNDS ALSO DEDICATED TO PUBLIC SCHOOL PURPOSES.

The majority opinion apparently holds that the General Assembly is vested with power to make loans for school buildings from any fund dedicated to *public school purposes*. If this be true, then clearly *this power must be held to extend to the teachers retirement fund*.

The teachers retirement fund is expressly and specifically

---

[4] As a matter of fact by Chapter 489 of the Acts of 1926 provision was made for all the State institutions of higher learning to issue self-liquidating dormitory income certificates of indebtedness. The State Board of Education was authorized to sell the bonds of the State held in the literary fund portfolio and with the proceeds purchase these dormitory certificates. The purpose of the act was to provide funds for the construction of dormitories. The certificates were to be retired out of rents from students living in the dormitories. The plan was highly successful and was used repeatedly through legislative enactments in subsequent years. The Education Board sold many of these certificates, reinvesting some of the proceeds in like newly issued certificates and some in loans for school buildings. See opinions of the Attorney General 1938-1939, pp. 22, 160, 250.

[5] The loans sustained in the *Cox Case*, it may be noted, are for all public schools, not just those "of the primary and grammar grades."

classified by the Constitution itself as being *dedicated to public school purposes*. That fund was in existence at the time of the proposal and adoption of the 1944 amendment to the literary fund section (134) of the Constitution. This amendment added to the original section 134, as above quoted, the following:

" * * * provided that when and so long as the principal of the literary fund amounts to as much as ten million dollars, the General Assembly may set aside all or any part of moneys thereafter received into the principal of said fund *for public school purposes including teachers retirement fund to be held and administered in such manner as may be provided by general law*." (Italics mine).

Thus the *literary fund section* of the Constitution, as amended since the decision in the *Cox Case*, expressly provides that the teachers retirement fund is included in "public school purposes." And logically so. The salaries which teachers will be entitled to receive upon their retirement are as much a part of their compensation for their work as the salaries paid them while actually working. The retirement pay is actually earned. It is not a gratuity. It is not paid out of the principal of the retirement fund, *but only out of the interest thereon*. It is in this respect like the literary fund, since only the interest from either is available for distribution for school purposes.

Furthermore, the amendment to section 134 provides that any amount set aside for teachers retirement fund is *"to be held and administered in such manner as may be provided by law."* This necessarily means the fund can be handled *in making school loans in the same manner as the literary fund itself was being administered at that time*, because the amendment contemplates a transfer of part of the literary fund to the retirement fund. I can conceive, therefore, of no logical principle upon which it can be said that the General Assembly possesses the power to employ the literary fund for school loans but cannot likewise employ the companion teachers retirement fund.

The next question which naturally arises is whether the

money owned by the State which constitutes a part of the teachers retirement fund is sufficient to satisfy the five million dollars needed for the proposed purchase of literary loans. An examination of the appropriation acts for the last four sessions of the General Assembly shows the following appropriations for the *teachers* retirement fund:

Acts 1942, p. 807, Item 110..............$ 2,160,750
Acts 1944, p. 669, Item 65...............$ 2,829,300
Acts 1946, p. 799, Items 71 & 72.........$ 5,157,695
Acts 1948, p. 1150, Items 75 & 76........$ 6,300,000

Total ..................$16,447,755

In addition to the above, other sums were appropriated for the *State* employees retirement fund. Also the teachers and employees made additional contributions to their respective funds.

This money contributed by the State belongs to the State and is required by statute to be held and invested so that the sums appropriated and those contributed by the teachers will earn sufficient revenue to discharge the State's obligation to pay the retirement salaries as they become due. As pointed out above, the literary fund section of the Constitution provides that the teachers retirement fund is one dedicated to "public school purposes," just as the literary fund is so dedicated.

The majority opinion holds that the money received in the literary fund from the sale of one of its loans for schools does not actually become part of the literary fund. It treats the transaction as an unlawful device to impart to retirement funds the peculiar qualities of the literary fund so as to render them eligible for loans to counties for the building of schools. The General Assembly no doubt considered, as the Attorney General contends, and as I agree, that it possesses the power to make these additional funds available for the discharge of its mandatory duty to provide moneys for schoolhouses. The plan adopted was not in-

tended to clothe retirement funds with any supposedly magical properties now attributed by the majority opinion to the literary fund. It was not considered that these moneys possessed any such hidden and mysterious qualities as to render them alone eligible for these loans. But it was designed to place the retirement funds used to purchase literary fund loans under the supervision of the State Board of Education so that they would be available for the construction of schoolhouses. There was legislation already on the statute books which imposed on the State Board of Education the duty of making these loans from the literary fund and which set up the procedure and machinery incident thereto. If the retirement funds were also eligible for such loans, it was simpler to use the existing procedure than to set up a new regime to accomplish the same end.

The holding in the *Cox Case* that such joint intragovernmental financing is not within the prohibitions of section 115-a of the Constitution is but analogous to the well-established rule that statutory provisions which would restrict the government in its operations are not applicable to the government unless expressly made so. For instance, in *United States* v. *United Mine Workers*, 330 U. S. 258, 67 S. Ct. 677, 91 L. Ed. 884, it is held that the Norris-LaGuardia Act prohibiting injunctions in labor disputes does not apply to strikes against the government. See also, 25 R. C. L. "Statutes," sections 31-33; 49 Am. Jur. "States, etc.," sections 14, 15. Section 115-a does not expressly provide that it shall be applicable to transactions within the government, and I think the opinion in the *Cox Case* is one hundred per cent sound in holding that it has no such application.

The only expedient method by which schoolhouses in counties can be financed is through money provided by the State or by bonded indebtedness incurred by the counties when approved by the qualified voters. A board of supervisors has no authority to create a building fund in advance which it or another board may not, in the meantime, divert and appropriate for other purposes. No such practice is

feasible or has ever obtained. Nor can the State finance these enterprises in its 140 subdivisions out of its current revenues, unless resort be had to extensive new taxation. This is recognized in the *Cox Case.*

The majority opinion expresses the view that the provisions of section 115-a are clear,—that it contains no "ambiguities" or "weasel words" needing "explanation." Standing alone, this is undoubtedly true, but is it equally as true of section 129. "The General Assembly shall establish and maintain an efficient system of public free schools." In the *Cox Case* we held joint State-county financing is necessary to enable the General Assembly to comply with section 129. The two sections—115-a and 129—are, therefore, irreconcilable under present existing conditions. Under the decision of the court in this case, the General Assembly is denied use of the only presently available funds to perform the duty laid upon it by section 129.

The majority opinion expresses the view that the Constitution intended to limit the amount which the General Assembly may make available for literary fund loans. But this is clearly rebutted by the conceded legislative power to add to the literary fund at any time by new appropriations.[6] The restriction here imposed by the court is not on the *power* of the General Assembly to make unlimited funds available, because it can add indefinitely to the literary fund by new appropriations. The restriction is rather a regulation of the *manner* in which this power can be exercised.

The General Assembly is not now powerless to appropriate money to be paid into the literary fund sufficient to meet the present needs. Such action, however, would seriously disrupt the State's plans for the retirement of its public debt. By Chapter 1 of the Acts of the 1942 Extra Session ten million dollars was appropriated to create a sinking fund, to be invested in securities of the United States,

---

[6] Section 134 of the Constitution provides that "the General Assembly shall set apart" as the literary fund "the present literary fund * * * ; and such other sums as the General Assembly may appropriate."

to be used to retire the refunding serial bonds of the State which were issued pursuant to Chapter 203 of the Acts of 1936. These bonds mature annually and the State is under no obligation to the bondholders to provide or maintain a sinking fund to retire them. It is within the power of the General Assembly to so amend said 1942 act as to require the sale of these securities and the payment of the proceeds into the general fund of the State treasury. The money could then be appropriated to the literary fund. Thus the decision of the majority here does not operate as a limitation upon the amount of money which may be made available for literary fund loans. It merely regulates the exercise of the legislative power in such manner as to constitute a most objectionable obstruction to the accomplishment of a legitimate purpose concededly within that power.

I do not think the court should interpose this obstruction.

There is nothing before the court to indicate or suggest that the State Board of Education and local school boards have overburdened the counties, or any one of them, with such loans, although for many years it has been deemed permissible to sell literary fund bonds to the Sinking Fund Commissioners when additional construction funds were needed. It is not for us to inquire whether the General Assembly has used good or bad judgment in making these retirement funds available for building schoolhouses. In the view I take of the matter, the restrictive action here taken by the court constitutes more nearly the exercise of a regulatory function than a judicial one.

In this regulatory field the General Assembly has plenary power to regulate the State Board of Education as well as the county boards in the making of these loans, and to prevent abuses from occurring.[7] One method of regulation open to it is, of course, to limit the funds available for that purpose. But this is a legislative, not a judicial, function, and it must be assumed that the voice of the taxpayers,

---

[7] Section 642 of the Code provides that "No loan shall be made in any case in which the payment of the same with interest would, in the judgment of the State Board of Education, entail too heavy a charge upon the revenues of the county or city to which such loan is granted."

has been reflected in the actions of their legislative representatives in the passage of the legislation here challenged. If there was objection among the taxpayers, it was not reflected in the actions of their Senators or Delegates. That there was none is evidenced by the fact that not a single member of the Senate or House of Delegates voiced any protest. On the contrary, the passage of both bills authorizing the sale and purchase of literary fund bonds was passed by the unanimous vote of both houses.[8] Furthermore, though the acts here declared invalid were passed, one in 1946, and the other in 1947, there has been no audible complaint from the taxpayers, nor have any of them filed an *amicus curiae* brief here protesting against it. It would seem, therefore, that the fears of the majority of the court that there is danger of an abuse of legislative authority in lending money to the counties for school buildings are not well-founded.

In this case I think we should adhere to the well-established principle expressed in *Richmond Fairfield R. Co.* v. *Llewellyn*, 156 Va. 258, 276, 157 S. E. 809, 162 S. E. 601, where we said the court cannot inquire "into the wisdom of the legislation. Nor may it pass upon the necessity for the exercise of a power possessed, since the possible abuse of a power is not an argument against its existence."

In *United States* v. *Butler*, 297 U. S. 1, 79, 56 S. Ct. 312, 80 L. Ed. 477, the Justices of the Supreme Court of the United States were admonished that: "The only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government."

In *Missouri, etc., R. Co.* v. *May*, 194 U. S. 267, 270, 24

---

[8] The Senate Journal of 1946, p. 622, shows that the vote on House Bill 364, the act authorizing the purchase by the Retirement Fund Trustees was Yeas 35, Nays 0; the House Journal, 1946, p. 652, shows the vote was Yeas 91, Nays 0. The Senate Journal of the 1947 Extra Session, p. 81, shows the vote on Senate Bill 20, authorizing the sale of the literary fund bonds was Yeas 36, Nays 0, while the House Journal, p. 215, shows the vote in the House was Yeas 81, Nays 0.

S. Ct. 638, 48 L. Ed. 971, Mr. Justice Holmes, speaking for the court, said that "It must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

And in *Tobacco Growers' Co-operative Ass'n* v. *Danville Warehouse Co.*, 144 Va. 456, 469-470, 132 S. E. 482, we said:

"Every act of the legislature is presumed to be constitutional and the courts are powerless to declare an act invalid, except where it appears *beyond doubt* that it contravenes some provision of the State or Federal Constitution. *If we doubt we must sustain its constitutionality.*" (Emphasis supplied). See also, *Mumpower* v. *Housing Authority*, 176 Va. 426, 444-445, 11 S. E. (2d) 732.

"In *Button* v. *State Corp. Comm.*, 105 Va. 634, 54 S. E. 769, this is said: 'The legislative department acknowledges no superior, except the Federal and State Constitutions, *and its authority to enact laws unless forbidden by one or the other of these instruments in express terms, or by necessary implication, is paramount.*'" (Emphasis supplied).

It is quite clear that the court here is overruling the cardinal principles enunciated in the *Cox Case* with respect to joint State-county financing of school buildings. Only two of the Justices who participated in that decision are now members of the court, Chief Justice Hudgins, who dissented in the *Cox Case*, and Mr. Justice Gregory, who was the author of the opinion which was concurred in by five of the seven justices. Five of the seven justices of the court as now constituted obviously think the conclusion reached in the *Cox Case* was incorrect. But that does not seem to me a sufficient reason to strike down legislation enacted on the faith of that decision. Particularly is this true when the principles overruled have been beneficial in their past application in securing Federal school building grants and no harmful results can be pointed out as ever having resulted therefrom. And this view is powerfully reinforced by the fact that the wisdom of applying these principles to this legislation have received the unanimous approval of the

membership of the General Assembly and the Governor of the Commonwealth. My thoughts on the subject are cogently expressed in the opinion in a case where the entire personnel of the court had changed since the decision which they had under consideration. The later judges did not agree with the prior decision, but a majority of them adhered to it. The court had the following to say on the subject:

" 'It is the duty of this branch of the government to pass finally upon the construction of a law, and determine whether the legislature in its action has transcended its constitutional limits, and the community has a right to expect with confidence we will adhere to decisions made after full argument and upon due consideration. The members of the court may change totally every six years, and, if each change in the organization produces a change in the decisions and a different construction of law under which important rights and interests have become vested, it is easy to see that the consequences will be most pernicious.' *Fisher* v. *Horicon Iron, etc., Co.,* 10 Wis. 351.

"The most indispensable guaranty of civil liberty, according to Mr. Hallam (1 Const. Hist. 230), is the 'open administration of justice according to known laws.' The law can be known only if fixed rules once established are consistently adhered to. Decisions of the courts are the highest evidence of what the law is. 'Respect for precedents alone can secure the stability and uniformity of the law. Without such respect it would be a shifting quicksand.' " (*Scown* v. *Czarnecki,* 264 Ill. 305, 106 N. E. 276, L. R. A. 1915B, 247, 259-260).

The general rule of *stare decisis* is thus stated in 14 Am. Jur., Courts, section 66, p. 287:

"Decisions construing the Constitution or acts of the legislature should be followed, in the absence of cogent reasons to the contrary, inasmuch as it is of the utmost importance that the organic and statute law be of certain meaning and fixed interpretation. * * * "

All of the general principles urged by the majority and concurring opinions in derogation of the power of the Gen-

eral Assembly to authorize loans from the *teachers retirement fund are equally applicable to literary fund loans to counties*, though the latter are upheld by both opinions. The inference would seem to be that the statute permitting such loans is of "doubtful constitutionality." In this situation, it is appropriate to reiterate what Judge Burks had to say in *Portsmouth* v. *Weiss*, 145 Va. 94, 133 S. E. 781, which was this:

"Whenever a statute is enacted by the legislature, it is a legislative declaration that it is a constitutional enactment, and when approved by the Governor it is an executive declaration to the same effect. Hence the oft-repeated declaration that all doubts about the constitutional validity of a statute are to be resolved in favor of its validity, and that there is no such thing as a statute of doubtful constitutionality."

I will summarize my views as follows:

First: I think the court should hold that section 115-a of the Constitution does not impose any limitation on the particular funds or moneys the General Assembly may employ in jointly financing, with the counties, the construction of school buildings which have been approved by the State Board of Education.

Second: If the majority of the court is of opinion that only trust funds owned by the State *which are dedicated to public school purposes* can be employed, the court, nevertheless, should sanction the use of the money in the teachers retirement fund contributed by and owned by the State, the interest from which is dedicated to the payment of teachers retirement salaries. This upon the principle of the maxim *ut res magis valeat quam pereat*,—that a statute will be so construed as to render it constitutional if possible to do so. *Commonwealth* v. *Carter*, 126 Va. 469, 483-484, 102 S. E. 58. I think a mandamus should be awarded directing the issuance by the comptroller and payment by the treasurer of the warrants in question out of the teachers retirement fund not in excess of the amount therein owned by the State.

Third:  I concur in the view of the majority of the court as expressed in the concurring opinion of the Chief Justice that section 115-a imposes no restriction upon the sale by the State to other governmental agencies of literary fund loans made to its *municipalities*.

GREGORY, J., concurs in this opinion.